[No. S004550; Crim. No. 23152 Mar. 23, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
LARRY H. ROBERTS, Defendant and Appellant.

COUNSEL

Dennis P. Riordan and George J. Cotsirilos, Jr., under appointments by the Supreme Court, Riordan & Rosenthal, Nina Rivkind, Karen Snell, Breakstone & Cotsirilos, Cotsirilos & Campisano and Guy A. Campisano, Jr., for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Steve White, Richard B. Iglehart and George Williamson, Chief Assistant Attorneys General, John H. Sugiyama, Assistant Attorney General, Herbert F. Wilkinson, Charles R. B. Kirk, Dane R. Gillette and Ronald S. Matthias, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

MOSK, J.—Defendant was charged with, and found guilty by a jury of, the following offenses: the first degree murders of Charles Gardner, a fellow prison inmate, and Albert Patch, a correctional officer (Pen. Code, § 187);[1] conspiracy to commit murder (§ 182); assault by a life prisoner resulting in death (§ 4500); and possession of a weapon by an inmate (§ 4502). The jury also found true special circumstance allegations that defendant had previously been convicted of first degree murder (§ 190.2, subd. (a)(2)), that he had committed multiple murders (§ 190.2, subd. (a)(3)), and that he had lain in wait to kill Gardner (§ 190.2, subd. (a)(15)). He was sentenced to death for the murder of Gardner and for the violation of section 4500, and to life imprisonment without possibility of parole for Patch's killing. A codefendant, Archie Menefield, was found guilty in a joint trial of similar charges stemming from the same incident, and was sentenced to life imprisonment without possibility of parole.

For reasons that will appear, the judgment is reversed with regard to the murder of Patch. The multiple-murder special-circumstance finding is set aside. In all other respects, the judgment is affirmed.

I. FACTS

A. *The Guilt Phase.*

Early on the morning of August 17, 1980, Charles Gardner, an inmate at the California Medical Facility, Vacaville, walked down a first-floor corridor as his fellow inmates lounged against the walls on both sides. He emerged

---

[1]Unspecified statutory references are to this code.

with 11 stab wounds that would shortly prove to be fatal. Nevertheless, he was able to grab a knife that an assailant had left on the floor. In pursuit of Menefield, Gardner ran or staggered some distance up a flight of stairs to the second floor, where he plunged the knife into the chest of a prison guard, Officer Patch. Patch died within the hour at the prison clinic, Gardner shortly afterward.

Two issues dominated the trial: the identity of Gardner's murderer or murderers, and Gardner's mental state when he attacked Patch.

The prosecution sought to prove defendant killed Gardner. It offered evidence to support two scenarios, both based on a theory that Gardner was killed in a gang dispute. One possibility was that defendant and Menefield planned to kill Gardner as part of a conflict among members of the Black Guerrilla Family (BGF), a prison gang. Gardner was the protégé of Ruben Williams, the Vacaville BGF leader, with whom defendant disagreed over gang tactics. However, there was evidence that cast doubt on this possibility: defendant may have obtained the prison-made knife with which he stabbed Gardner from Williams himself. The other possibility was that defendant stabbed Gardner because he had called him a "punk nigger" in the prison yard and thereby showed disrespect to a fellow BGF member. "Punk" is prison jargon for a passive homosexual. There was testimony that the term is a serious insult to many inmates, and was intolerable to defendant.

Inmates testified they saw defendant stab Gardner repeatedly and saw Menefield restrain Gardner when he tried to escape. After the incident, witness Cade was sent to maximum security for fighting with another inmate and spoke with defendant, who was being held there as a suspect. Cade testified defendant told him that he had done the deed. Cade further testified that defendant said Gardner wanted to withdraw from the BGF and had threatened another inmate, and that Williams had ordered a "move on him" if Gardner posed a threat to the inmate. According to Cade, defendant also said that after he attacked Gardner defendant ran to the third floor. Another inmate testified that he heard Menefield and defendant argue about the assault after it took place. According to that inmate, defendant asked, "Why didn't you pick up the knife?" Menefield assertedly replied, "Because I was running right behind you up the stairs." Inmate Long testified that he saw defendant stab Gardner and then run up to the third floor.

In response, defendant introduced evidence that the prosecution's key witnesses—inmates Long, Hayes, Cade, and Rooks—had won benefits from the state that gave them a motive to lie. Defendant also contended that witnesses had been housed together and had had a chance to reconcile their testimony.

Defendant did not testify at the guilt phase. He sought to prove that he was on the third floor when Gardner was stabbed. There was evidence that he had been seen at that location just after an alarm had sounded as a result of the attack and that it was impossible for him to have made his way there from the first floor in time. For its part, the prosecution introduced evidence that an agile person could run from the first floor to certain key locations in seconds and walk briskly to defendant's cell in less than one minute, and that defendant could have done so unseen.

Defendant also sought to prove that the stabbing of Gardner was not the proximate cause of his death: there was evidence that Gardner was relatively well physically on arrival at the prison clinic and died as a result of incompetent medical care.

As for Patch's killing, there was evidence that Gardner, though failing rapidly, pursued Menefield up the stairs to the second floor. Prison guards hearing the commotion rushed toward the two, seizing Menefield and, in the case of Patch, trying to secure Gardner. Gardner then stabbed Patch.

The prosecution presented expert testimony to support its theory that Gardner fell rapidly into shock from loss of blood after his stabbing and became an unconscious agent of defendant. Prison workers described Gardner as a well-behaved inmate with no innate desire to attack a guard. Defendant introduced evidence that Gardner intended to stab Patch to exact revenge on his keepers, whom he hated, and that when he attacked Patch he was physically capable of thinking for himself and merely took advantage of the opportunity presented by having a knife in hand.

B. *The Penalty Phase.*

In aggravation, the People introduced evidence of prior violent criminal activity and a prior felony conviction. In 1970, on his 17th birthday, defendant shot and killed a high school security guard, Obidee Cowart, and was convicted of first degree murder. There was also evidence of continuing BGF membership found in defendant's cell at Soledad Prison, including a note addressed to defendant in Menefield's handwriting saying that a possible witness to Gardner's stabbing would have to be killed. Further, defendant had stabbed three inmates besides Gardner and had been caught with the paraphernalia of violence in prison.

Defendant testified at the penalty phase. In mitigation, he presented evidence bearing on background and character. He grew up virtually without social and emotional support. He was the eldest of five siblings, each of

whom had a different father. His mother, an abusive alcoholic, was 15 when she gave birth to him; she never lived with defendant's father. When she drank she would neglect the children; she and the man she lived with for 13 years would burn and stab each other in front of them. Defendant would steal food for his siblings when his mother's welfare money went to buy alcohol. Defendant grew up in a dreary section of the Watts neighborhood in Los Angeles; when he was 12, his family moved to a notoriously dangerous housing project.

Defendant testified that he had not intended to kill Cowart but had acted instinctively in self-defense after the latter had pulled a gun on him. He also stated that he fell out with the BGF over its practice of assaulting people who disobeyed its rules or policies. For that reason, he said, the gang tried twice to have him killed. He learned that an inmate named Lynch had ordered a BGF attack on him, and stabbed him in revenge. He wanted to escape the BGF but had to maintain an appearance of continued adherence lest he be killed for trying to quit. He could not completely disassociate himself from the BGF until he was sent to Tehachapi Correctional Institution, a transfer he earned by good behavior. He testified that he had earned a high school equivalency degree and had taken college correspondence courses.

## II. GUILT PHASE ISSUES

### A. *Evidentiary Issues.*

#### 1. *Introduction of Evidence of Gang Membership and Activity.*

In a motion *in limine*, codefendant Menefield, on behalf of both defendants, sought a hearing to exclude evidence of the defendants' gang membership, apparently on grounds of relevance. The court allowed the testimony to be introduced at trial. ■ Defendant now contends the evidence was irrelevant and substantially more prejudicial than probative.

Defendant concedes, however, that the court apparently never ruled explicitly on the motion *in limine*, but noted only in passing during a hearing on another matter that it thought such evidence was relevant to motive and identity. Nor does the record reveal an objection at trial. Because defendant failed to obtain a pretrial ruling on the issue and did not pursue his objection at trial, we will not address his contention, for it is procedurally barred. (See *People* v. *Morris* (1991) 53 Cal.3d 152, 189 [279 Cal.Rptr. 720, 807 P.2d 949].)

The prosecution also introduced the testimony of current or former government investigators Samuel L. Brown, Thomas L. Hartman, and Manuel

Gloria about BGF practices and rules. At a pretrial hearing, the prosecutor referred to Brown and Gloria as experts. Defendant requested discovery of all documents and other sources from which the witnesses had derived their knowledge, even if complying would mean producing everything one witness had seen for seven years. The court rejected the request as too broad and burdensome. As an afterthought, Menefield then briefly expressed a concern that the evidence offered would be hearsay. The court said that hearsay could not be avoided in offering any opinion and left the matter open until trial.

At trial, Brown read a copy of the BGF oath to the jury. He was then asked to interpret the oath; Menefield objected, in essence on the ground of lack of expertise. Before the court responded, Brown stated he had talked to BGF members about the oath and knew what it meant; defendant objected to this testimony as hearsay. The court overruled both objections. Brown testified he had developed an expertise in the activities of the BGF during seven and one-half years in the investigative branch. He described the gang's structure and interpreted the gang's credo for the jury. Later motions to strike the testimony as hearsay and to produce the documents on which Brown relied were denied. Gloria described BGF involvement in drug trafficking and other prison activities; defendant unsuccessfully renewed the same objection he had made to Brown's testimony.

Hartman, a witness with four years' experience in the investigative office, also testified over objection about certain BGF rules and practices. The prosecutor asked Hartman what the rules required a backup member to do if the person doing a "hit" had trouble with the victim. Defendant and Menefield objected on the ground, inter alia, of lack of foundation. The court allowed the witness to continue. Hartman said that he was familiar with gang rules through conversations with inmates and other investigators, and that the backup man is required under penalty of death to aid the assailant.

■ Defendant contends this testimony was inadmissible because the witnesses were not qualified as experts on prison gangs or on the BGF in particular and lacked personal knowledge of the substance of their testimony. The claim is unpersuasive.

First, defendant never sought to challenge the witnesses' qualifications as experts, and it is too late to raise the issue now. Moreover, the decision of a trial court to admit expert testimony will not be disturbed on appeal unless a manifest abuse of discretion is shown. (*People* v. *McAlpin* (1991) 53 Cal.3d 1289, 1299 [283 Cal.Rptr. 382, 812 P.2d 563].) Given the witnesses' background and experience, we would not have disturbed the trial court's

decision to admit their testimony had defendant timely challenged their qualifications.

■ Defendant contends his Sixth Amendment confrontation rights were violated when the court denied his motion at trial to produce the materials on which the officers relied to interpret the BGF oath and rules. The confrontation clause of the Sixth Amendment did not entitle defendant to the vast array of materials he requested before and at trial. (See *Pennsylvania* v. *Ritchie* (1987) 480 U.S. 39, 52-53 [94 L.Ed.2d 40, 54-55, 107 S.Ct. 989] [pretrial discovery request].) Unlike *People* v. *Price* (1991) 1 Cal.4th 324, 420-421 [3 Cal.Rptr.2d 106, 821 P.2d 610], the present case does not involve expert witnesses who refused to answer any questions posed to them on cross-examination regarding the sources from which they derived their expertise.

■ Defendant also alleges a violation of his due process rights because the court permitted the introduction of evidence of BGF activity with which he had no connection. We perceive no fundamental unfairness. The court did not abuse its discretion in permitting the prosecution to explore the nature of prison-gang life in order to elucidate its theory of the case, at least insofar as such testimony was necessary to furnish the jury a context for understanding that theory.

### 2. *Evidence of Gardner's Mental State.*

The prosecution sought to prove that Gardner was not inclined to attack Patch of his own free will, and the court allowed two witnesses to testify to Gardner's lack of a violent disposition. Defendant objected on the ground of improper character evidence to the testimony of the first witness, James T. Donovan, a guard. Donovan stated that Gardner "felt that he had shown by his behavior that he had changed, that he had a different outlook," and that he had remained "disciplinary-free" for some time. A psychiatrist, Dr. Grant Garlock, testified without objection that Gardner "stated again that he wanted to change his life around, that he had ambitions for himself to get things put together . . . ; he wanted to get out of prison and be a productive member of society, get married and settle down." While "[h]istorically speaking . . . he was reclusive, seclusive, hostile, defensive and highly aggressive," Dr. Garlock "never knew him in that condition because the first time I ever met him he was docile, cooperative, reserved, quiet, distant, [and] very proper and polite. . . . He was an ideal model prisoner . . . ."

■ Defendant complains of the foregoing evidence. He failed to object to Dr. Garlock's testimony, and hence has failed to preserve that claim of error.

Donovan's testimony was not offered to prove Gardner's conduct on the occasion of his stabbing of Patch; Gardner's conduct was undisputed.

Though Evidence Code section 1100 permits the introduction of character evidence except as otherwise provided by statute, a major exception is that such evidence is generally inadmissible to prove a person's conduct on a specific occasion. (Evid. Code, § 1101, subd. (a).) Thus, if Donovan's testimony had been offered to prove conduct, it is arguable that it should not have been admitted. But the evidence was offered as part of the prosecution's effort to prove that Gardner was an unconscious agent and hence defendant's act was the proximate cause of Patch's death. We find no error.

Defendant also offered certain letters as evidence of Gardner's bad character. In defendant's view, Gardner's character was epitomized in one passage wherein Gardner stated, "It would be no more wrong for me to kill those who hold me in bondage than it would be for me to get a drink of water when thirsty." The prosecution objected to the letters as irrelevant and as substantially more prejudicial than probative. The court sustained the objection, stating that the evidence would confuse the jury and was irrelevant. (Evid. Code, §§ 350, 352.) Defendant did not pursue the matter further. ■ He now maintains the court erred under state law and also violated his right to due process when it excluded the letters. He argues that he should have been allowed to show through proof of more than one act demonstrating bad character that the conduct was the function of a character trait rather than an "aberration." (*People* v. *Castain* (1981) 122 Cal.App.3d 138, 143 [175 Cal.Rptr. 651].)

We disagree that the court erred under state law in excluding the epistolary evidence of Gardner's bad character. The court and counsel discussed two letters in detail. The defense conceded that the first letter related Gardner's attitude toward one correctional officer only and that it possessed other evidence of Gardner's bad character at Folsom Prison, whence the letter apparently was sent. It appears the letter may not have been dated; the court was concerned that it might have been written during one of Gardner's psychotic episodes. The second letter, in which Gardner says he could as soon kill those who hold him as quench his thirst, may have been written as early as a decade before his and Officer Patch's death. Moreover, the other evidence of Gardner's bad character that the defense introduced was strong: it described a course of conduct that included fighting with and seriously injuring guards as well as cursing them, and other bad acts that became the subject matter of both documentary and testimonial evidence. The court's finding that the letters were of dubious relevance because of their possible remoteness and Gardner's questionable mental state, and also that they were confusing, cannot be deemed an abuse of discretion. For the foregoing reason, no violation of federal due process appears; the due process clause does not entirely strip a trial court of its power to exclude evidence on

grounds of irrelevance or potential confusion, and the rulings here did not, in our view, offend due process. (See *People* v. *Babbitt* (1988) 45 Cal.3d 660, 684-685 [248 Cal.Rptr. 69, 755 P.2d 253].)

### 3. *Exclusion of Evidence of Removal of Tattoo.*

Because other inmates gave damaging testimony against defendant, an important part of his defense consisted of an attack on their credibility. To this end, he introduced evidence that the inmate witnesses who testified for the prosecution had won benefits from the state for their efforts.

Witness Cade was an inmate in federal prison during trial. Cade's testimony was important to the prosecution because he stated that he saw defendant, a knife protruding from his waistband, lingering near the Vacaville medical clinic before the attack on Gardner. He testified that he saw defendant stab Gardner, drop the knife, and run up the stairs. A few days later, according to Cade, defendant admitted he had killed Gardner.

On cross-examination Cade conceded that he had asked for an accelerated parole date and was told that the request could not be honored. He also received $40 from the state. However, Cade denied having received any other favors.

The defense then sought to have a tattoo specialist, Lyle Tuttle, testify that he had charged the state $100 to remove a tattoo from Cade. The prosecution objected before Tuttle took the stand, asserting a privilege of nondisclosure of confidential official information. (Evid. Code, § 1040.)[2] Apparently the prosecutor wanted to protect Cade, who was under consideration for a witness-protection program and had already been in protective custody, from the disclosure of any information about alteration or removal of his tattoos that would make it easier for other inmates to identify him later. After an in camera hearing with only the prosecutor present, the court sustained the objection under Evidence Code section 1040, subdivision (b)(2), quashed Tuttle's subpoena, and refused the defense's demand for an admonition to inform the jury that Cade had received additional emoluments.

---

[2] Evidence Code section 1040 provides in part:

"(a) As used in this section, 'official information' means information acquired in confidence by a public employee in the course of his or her duty and not open, or officially disclosed, to the public prior to the time the claim of privilege is made.

"(b) A public entity has a privilege to refuse to disclose official information, and to prevent another from disclosing official information, if the privilege is claimed by a person authorized by the public entity to do so and:

" . . . . . . . . . . . . . . . . . . . . . . . . .

"(2) Disclosure of the information is against the public interest because there is a necessity for preserving the confidentiality of the information that outweighs the necessity for disclosure in the interest of justice . . . ."

■ First, defendant contends that even if it was proper to exclude the evidence, the court erred when it refused his demand for the admonition that Cade had received additional benefits. He contends such an admonition was required by Evidence Code section 1042, subdivision (a).

We agree. Under Evidence Code section 1042, subdivision (a), when the claim of privilege under Evidence Code section 1040 was sustained, the court was to "make such order or finding of fact adverse to" the prosecution "upon any issue . . . to which the privileged information is material."

Defendant also says the court misapplied Evidence Code section 1040 when it excluded the evidence. Again we agree.

The official information privilege codified in that section applies to information that a "public employee" acquires in confidence. A public employee includes an agent of a public entity. (Evid. Code, § 195.) Tuttle removed Cade's tattoo for value at the behest of the state and was clearly its agent while performing this service. But the information requested was no longer confidential; the defense had learned of it. The court thus erred when it quashed the subpoena.

Nevertheless, we find no prejudice arising from the two errors. Cade was impeached thoroughly by other means, so that no prejudice arises from the misapplication of Evidence Code section 1040. Nor is it reasonably probable that, had the court given the admonition requested under Evidence Code section 1042, the outcome for defendant would have been more favorable. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

■ Defendant also raises a multitude of constitutional contentions. He asserts that his right to present a complete defense, whether under the Sixth Amendment or the due process clause, was violated, as were his Sixth Amendment and state constitutional rights to be present during the in camera hearing.

For his first point, defendant relies on *Crane* v. *Kentucky* (1986) 476 U.S. 683, 690 [90 L.Ed.2d 636, 645, 106 S.Ct. 2142], where the court reversed a judgment after the trial court excluded evidence "central to the defendant's claim of innocence." The evidence excluded here does not fall into this category. We therefore reject the claim. As for the second point, defendant fails to persuade that he has a constitutional right to be present at an in camera hearing at which the prosecution will reveal sensitive and possibly privileged information. We believe the prophylactic effect of Evidence Code section 1042 suffices to protect a defendant against the consequences of any decision arising from such a hearing.

■ Defendant also claims that his state and federal due process rights were violated when the prosecutor failed to disclose the evidence of Cade's tattoo to him and when the court curtailed the adverse testimony. With regard to the first point, due process was not violated unless the withheld information was material to the outcome. (*United States* v. *Bagley* (1985) 473 U.S. 667, 682 [87 L.Ed.2d 481, 494, 105 S.Ct. 3375] (lead opn. of Blackmun, J.); accord, *id.* at p. 685 [87 L.Ed.2d at p. 496] (conc. opn. of White, J.).) Here, the withholding of the evidence in question does not undermine confidence in the outcome, given the other impeaching evidence defendant introduced. Defendant predicates his second point on an argument that he was denied a meaningful opportunity to present a complete defense. The record, however, belies that view.

### 4. Claim of "Bruton-Aranda" Error.

Defendant moved before trial to sever his trial from Menefield's on the ground that the prosecution planned to introduce extrajudicial statements of Menefield that implicated defendant. In response, the prosecution proposed to edit the statements. At a pretrial hearing, the defense expressed satisfaction with the editing, with reservations that the court decided to address at trial. The motion therefore was denied.

At trial, witnesses Rooks and Long described a conversation or conversations that took place the evening before the incident, in which Menefield said, in Rooks's words, that Menefield was "going with him," meaning defendant, to resolve the dispute between defendant and Gardner that had arisen in the yard. Long testified that Menefield said "he knew he would have to be there but [he] didn't want to be there." The court overruled a *Bruton/Aranda* objection[3] to Rooks's testimony, apparently finding the statement was made by one coconspirator during and in furtherance of a conspiracy and hence was admissible as an exception to the rule that a codefendant's hearsay statement is inadmissible.[4]

■ We first inquire whether substantial evidence supported the court's implied finding that Rooks's statements were made during and in furtherance of a conspiracy. (Cf. *Bourjaily* v. *United States* (1987) 483 U.S. 171, 181 [97 L.Ed.2d 144, 156, 107 S.Ct. 2775] [applying federal "clearly erroneous" standard].) There was a showing that defendant and Menefield were in agreement and that Menefield made his statement in preparation for the next

---

[3] *Bruton* v. *United States* (1968) 391 U.S. 123, 126 [20 L.Ed.2d 476, 479-480, 88 S.Ct. 1620]; *People* v. *Aranda* (1965) 63 Cal.2d 518, 530-531 [47 Cal.Rptr. 353, 407 P.2d 265].

[4] There was no objection to Long's testimony, and any question of the propriety of that testimony was not preserved for appeal.

morning's assault. But the record does not reveal that the statements were made in furtherance of the conspiracy's objective (see Evid. Code, § 1223)— Menefield was not asking Rooks or Long for help. We conclude that the implied finding is not supported by substantial evidence.

Under the law as it existed when Gardner and Patch were killed, a hearsay declaration of one defendant that incriminated another in a joint trial was inadmissible because it violated the nondeclarant defendant's federal confrontation rights and a state judicially created procedural rule to the same effect. (*Bruton* v. *United States, supra,* 391 U.S. 123, 126 [20 L.Ed 2d at pp. 479-480]; *People* v. *Aranda, supra,* 63 Cal.2d 518, 530-531.) Under state law and federal constitutional law, the rule does not apply to statements made by coconspirators during and in furtherance of the conspiracy. (*People* v. *Brawley* (1969) 1 Cal.3d 277, 286 [82 Cal.Rptr. 161, 461 P.2d 361]; *Bourjaily* v. *United States, supra,* 483 U.S. at pp. 181-184 [97 L.Ed.2d at pp. 156-158].) But because the court erred in finding the statements to come within the coconspirator exception, defendant's state and federal rights were violated.

Nevertheless, under any standard the error must be deemed harmless. It is not reasonably probable—indeed, it is extraordinarily improbable—that the admission of Rooks's statement led to a less favorable outcome for defendant.

██ Next, Rooks was prepared to testify that he heard Menefield say, when the two were in detention following the killings, that Menefield did not want to go with defendant to confront Gardner but just could not tell him "no." Defendant objected that this statement, which came after the conspiracy had ended, would implicate him. The prosecution agreed to try to have Rooks tailor his testimony to avoid mentioning defendant. Rooks then told the jury only that he had spoken with Menefield about Gardner, and "He told me he was down on the floor when the incident happened . . . because he couldn't say 'no.' " The court admonished the jury that the testimony "is to be taken only as against defendant Menefield and not defendant Roberts."

Our reading of the record reveals no error in the admission of this statement. Defendant argues the editing was ineffective because the jury must have known Rooks was referring to him. He relies heavily on cases in which the admission of statements containing ambiguous pronouns was held to be error because the jury could infer that the nondeclarant codefendant was a participant. (E.g., *People* v. *Massie* (1967) 66 Cal.2d 899, 919 [59 Cal.Rptr. 733, 428 P.2d 869]; *People* v. *Fortman* (1970) 4 Cal.App.3d 495, 498 [84 Cal.Rptr. 458]; *People* v. *Smith* (1970) 4 Cal.App.3d 41, 50 [84 Cal.Rptr. 229].) But Rooks uttered no ambiguous pronoun that could have

been perceived as including defendant; his references were either to himself or Menefield, but none were to defendant.[5]

### 5. *Evidence of Alleged Uncharged Offense.*

■ Defendant contends the court erred in denying his motions to exclude Rooks's rebuttal testimony that he wanted to testify because defendant had given "the order to have me hit," and for a mistrial based on that statement. Defendant also objected to a Department of Justice employee's statement that certain witnesses were placed in protective custody "because of the death threats," and contends that the employee's statement compounded the error even though it was stricken. In an in camera discussion following Rooks's testimony, the prosecution contended the statement was admissible to show that Rooks's motive for testifying was not any inducement by the state but his dislike for defendant, based partly on defendant's alleged "order."

Defendant objected to Rooks's statement because it was improper character evidence offered via prior acts of misconduct and because it was substantially more prejudicial than probative. We examine the record to determine whether the court abused its discretion in admitting the statement. (See *People* v. *Perez* (1981) 114 Cal.App.3d 470, 477-478 [170 Cal.Rptr. 619]; *Allen* v. *Toledo* (1980) 109 Cal.App.3d 415, 419-421 [167 Cal.Rptr. 270].)

We discern no such abuse. First, the statement was not improper character evidence. It tended to establish that Rooks's motive for testifying was resentment of defendant rather than any inducement the state had given him—and which defendant had emphasized to impeach Rooks's credibility. Thus, the case is similar to *People* v. *Green* (1980) 27 Cal.3d 1, 19-20 [164 Cal.Rptr. 1, 609 P.2d 468], in which we rejected a like contention. As for defendant's contention that under Evidence Code section 352 and cases discussing the Federal Rules of Evidence the evidence was unduly prejudicial, we perceive the degree of prejudice as slight. The jury had already properly heard evidence that defendant was a member of a prison gang with strict rules prohibiting testimony against other members. Rooks's statement that defendant's death threat motivated him to testify was more of the same, but was also proper.

---

[5]Defendant did not object to a statement by Officer Robert Horton that Menefield told Horton that Menefield and Ruben Williams had been present at the attack on Gardner "for protection if anyone interfered." We therefore do not address his contention that it was error to admit this statement.

### 6. *Defendant's Attendance at Jury View.*

 Defendant next contends the court erred in compelling him to choose between appearing at a jury view of the crime scene in shackles or not at all. We disagree.

When the issue first arose, counsel announced that defendant would waive his right to be present when the jury toured the prison because he believed that without "heavy security including shackles and a number of guards following along" defendant would not be allowed to be present. After defendant pointed out that he was already confined in the same institution without handcuffs, the prosecution offered to investigate what type of security would be required, and defendant agreed.

The next court day, defendant stated he could not "understand why some kind of special concession is being made for this jury, why I got to be handcuffed and shackled. I don't understand that." The court acknowledged the concern but said, "I have nothing to say about the Department of Corrections. It's the same thing with the county jail. The Sheriff runs his office. I run mine, and all I know is that they have their rules up there. I am powerless to make any other rules. I can't." The prosecution implied that prison officials believed defendant should not be allowed to walk around in the jury's presence free of restraints, and the court formally found that special restraints would be necessary. Defendant then stated that he would waive his appearance, saying, "Since I am being forced to, I guess I have to."

A defendant has a right under state law to be present at a jury view, though the right may be waived. (*People* v. *Lang* (1989) 49 Cal.3d 991, 1025 [264 Cal.Rptr. 386, 782 P.2d 627].) There is no federal constitutional right to be present. (*Ibid.*) In *People* v. *Lang* we found it unnecessary to "decide whether a waiver of the right to presence would be involuntary if the waiver was in response to a ruling requiring the defendant to appear in shackles plainly visible to the jury." (*Id.* at p. 1026.) The court's ruling in the case at bar may fairly be so read. The court found that security considerations required defendant to be shackled at the jury view, and that the court was powerless in the matter.

We have previously held that the record must reflect the particular reasons why special restraints are necessary during the taking of evidence inside the courtroom. (See *People* v. *Duran* (1976) 16 Cal.3d 282, 290-291 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1].)

We do not believe such a strict showing is required for a jury view outside the courtroom. Rather, we agree with the Supreme Court of Michigan that a

court ordinarily may exercise discretion to require the restraining of a defendant at a jury view outside the courtroom "on the basis of previous conduct of the defendant or other manifest circumstances." (*People* v. *Mallory* (1984) 421 Mich. 229 [365 N.W.2d 673, 683].) The trial court should explain its reasons on the record.

This unusual case embodies an exception to the rule we set forth today, however. The trial court correctly found it had no power to compel prison officials to alter the special rules that perforce exist in a prison setting. In making its statement, the court was not saying that it had no discretion to decide a defendant's freedom from visible restraints during a jury view, but rather that its power was limited when the view was to occur in prison. ▆▆▆ We find no error.[6]

### 7. *In Camera Review of Rap Sheets.*

Defendant demanded access to the rap sheets of all inmate witnesses, stating he was entitled to discover all their prior felony convictions. The prosecution resisted, saying it was obligated to provide information only about convictions bearing on a witness's truthfulness. As permitted by Evidence Code section 915, subdivision (b), which authorizes such a hearing, the court ordered in camera review of the rap sheets in the absence of defendant and his counsel. In the review the prosecution and the court decided that certain convictions—primarily for murder and manslaughter—did not involve deception and need not be disclosed, while others for, among other things, robbery, theft, or burglary must be revealed. Moreover, after in camera examination of one potential inmate witness, the court found the witness could provide no exculpatory information and ordered his identity kept secret. The witness was not called to testify.

▆▆ Defendant contends he was entitled as a matter of state procedure and state and federal constitutional law to discover all the adverse witnesses'

---

[6]Defendant calls our attention to cases in which courts have found prejudice per se when jurors were interviewed in the defendant's absence. (E.g., *People* v. *Medcoff* (1955) 344 Mich. 108 [73 N.W.2d 537, 543]; *State* v. *Carver* (1972) 94 Idaho 677 [496 P.2d 676, 679].) First, these cases are not California law. Second, *Medcoff* has been overruled. (*People* v. *Morgan* (1977) 400 Mich. 527 [255 N.W.2d 603, 606]; see *People* v. *Woods* (1988) 172 Mich.App. 476 [432 N.W.2d 736, 738].)

Defendant's counsel was ill on the day that the court and counsel convened to discuss certain other routine procedures for the jury view. The record shows that Menefield's counsel was present with the prosecution and the court. Defendant contends in passing that the failure to include him in this discussion violated his statutory and constitutional rights to be present during the proceedings and his Sixth Amendment right to counsel at all stages of his trial. But defendant does not say that he later objected to the routine jury-view procedures. For that reason we conclude he has not preserved the claim on appeal.

rap sheets. He further contends he was entitled to be included in the discussion at which the admissible convictions were separated from the inadmissible. He asserts that the error in failing to make the prosecution disclose all felony convictions was prejudicial because such disclosure would have shed light on the length of the sentences of key witnesses against him. Hence it would have provided the jury with additional information on the value of such prosecution blandishments as letters to the parole board— letters whose weight would be greater if an inmate were otherwise facing a long term with scant possibility of parole. Finally, defendant contends the prosecution failed to disclose a burglary conviction that came to light in the in camera discussion.

While we disagree that the rap sheets themselves should have been disclosed, we agree that the court erred as a matter of state procedural law in failing to order disclosure of all felony convictions to the defense. In *Hill* v. *Superior Court* (1974) 10 Cal.3d 812, 821 [112 Cal.Rptr. 257, 518 P.2d 1353, 95 A.L.R.3d 820], we decided that rap sheets themselves need not be disclosed, but that a trial court should exercise its discretion in favor of allowing the defense to discover all felony convictions when good cause is shown for the discovery and it does not appear the disclosure will unduly hamper the prosecution or impair some other legitimate government interest.

Among the offenses excluded were such serious crimes as first and second degree murder, arson and manslaughter. Whether the records of these offenses were admissible or not, we believe that defendant showed good cause to discover them, and that their disclosure did not impair a legitimate government interest. Hence the court abused its discretion in failing to allow discovery of the adverse witnesses' felony convictions. The rap sheets themselves, of course, did not have to be disclosed in order to provide the requested information.

Nevertheless, it is not reasonably probable that had defendant had the benefit of the wrongly excluded information, he would have achieved a better result. The inmate witnesses were thoroughly impeached by evidence of state-provided benefits, prior inconsistent statements, and the like. And the jury knew they were incarcerated in prison for a felony. ▬▬ We discern no prejudice.[7]

---

[7]Defendant asserts the Sixth Amendment right to counsel required his counsel's presence during the in camera hearing, and his Sixth Amendment confrontation right required revelation of the adverse witnesses' prior convictions. With regard to the first claim, we do not believe the Sixth Amendment confers a right to be present during proceedings on privileged matters, nor do the cases defendant cites so hold. And for the reasons set forth in the text, we conclude that any violation of defendant's federal confrontation rights was harmless beyond a

### 8. *Prosecutor's Testimony and Reference Thereto in Closing Argument.*

■ Defendant contends the prosecutor engaged in prejudicial misconduct during closing argument. This contention is not persuasive.

Defendant sought to prove that he could not have stabbed Gardner because he was on the third floor immediately after the alarm sounded. Defendant argued that to reach the third floor he would have had to run up the stairs from the first floor and thence through a locked gate.

The prosecution called Officer Robert Rudolph, Jr., to describe the whereabouts and activities of defendant and Menefield on the morning of the killings. He testified he was guarding the third floor between H Wing and a grille gate, and that he did not recall whether the gate was open or closed. When Rudolph heard the alarm following the attack on Gardner, he ran to the second floor; he did not recall whether he locked the gate behind him. On cross-examination, Rudolph testified he did not recall that defendant came through the gate within five minutes of the alarm's sounding.

The defense had been given a copy of the prosecutor's notes of a prior interview with Rudolph. The notes contained an apparent statement by Rudolph that he had locked the gate before going downstairs. But on the stand Rudolph denied having told the prosecutor that he had locked the gate, and also denied having told a defense investigator that he was in the main corridor before the alarm sounded.

Defendant called the prosecutor as a witness to authenticate his notes for use in impeaching Rudolph's memory. The prosecutor testified that the statement was an editorial comment of his own that had not come from Rudolph, who in fact had told him he could not remember whether he had locked the gate. Defendant now asserts that the prosecutor's closing argument implied he was privy to evidence not given the jury when he advanced a theory that Rudolph had indeed left the gate unlocked long enough for defendant to slip through unobserved.

---

reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

Defendant also contends he was entitled to discovery of the basis for certain prosecution witnesses' opinions regarding BGF rules and regulations, and information concerning witness Cade's reasons for testifying and showing his desire to be assigned to a camp. The first matter is addressed *ante*, at part II.A.1. We disagree that defendant was entitled to information that would disclose Cade's location. (*United States* v. *Bagley, supra,* 473 U.S. 667.)

Finally, defendant further contends in passing in a supplemental brief that the failure to provide him with the conviction information deprives him of a federal right to an effective appeal. We disagree: we have reviewed the claim; there was no deprivation.

Defendant did not assign misconduct to and request an admonition regarding the asserted comment. His claim therefore is procedurally barred. (*People* v. *Green*, *supra*, 27 Cal.3d 1, 27.) In any event, the record is insufficient to make out a claim of prosecutorial misconduct. Of course counsel may not testify during closing argument, but may only emphasize evidence properly adduced earlier. While in his closing argument the prosecutor occasionally used such phrases as "I know," the record belies the claim that he held himself out as an unsworn witness (see *People* v. *Bolton* (1979) 23 Cal.3d 208, 213 [152 Cal.Rptr. 141, 589 P.2d 396]). Rather, the record reveals that every fact to which the prosecutor alluded was supported by some evidence introduced at trial. The prosecutor thus did not, in our view, hint that he had access to facts damaging to defendant that were not before the jury. On other occasions when the prosecutor spoke in the first person in his closing argument to reinforce his own previous testimony, he was entitled to do so, because defendant had called him to the stand and thereby made the prosecutor's recollections part of the evidence.

Defendant also contends the prosecutor violated his Sixth Amendment confrontation rights by holding himself out as an unsworn witness. Defendant also claims the alleged misconduct violated his right to due process because he was not afforded a fair trial. For the reasons stated above, we disagree with both contentions: the prosecutor did not commit misconduct or hold himself out as an unsworn witness.

B. *Instructional Issues.*

1. *Consciousness of Guilt.*

■ Defendant contends the court erred in telling the jury it could infer consciousness of guilt from his flight if flight was proved. We recently rejected the overly broad dictum of the case on which he mainly relies, *People* v. *Anjell* (1979) 100 Cal.App.3d 189 [160 Cal.Rptr. 669]. In *People* v. *Mason* (1991) 52 Cal.3d 909, 942-943 [277 Cal.Rptr. 166, 802 P.2d 950], we instead construed section 1127c as mandating a rule that if there is evidence identifying the person who fled as the defendant, and if such evidence is relied on as tending to show guilt, then a flight instruction is proper. In this case, the prosecution presented evidence that defendant fled up the stairs from the first to the third floor after stabbing Gardner. The instruction therefore was correct.

■ Next, defendant contends the court erred in instructing the jury it could infer consciousness of guilt from his refusal to take a blood test.

At trial the prosecution introduced evidence that defendant had refused to take a blood test and that a court order had been obtained, after which

defendant submitted to the test. Defendant specifically stated he did not object to this testimony, even though the prosecution said it wanted to introduce the evidence to show an "admission of guilt by refusing to give physical evidence from his body . . . ." The prosecution sought the instruction to which defendant now assigns error, and then defendant objected. Another lawyer for the defense team noted that a person could refuse to give blood for fear of needles, but the prosecutor responded that defendant had given no reason for his refusal.

Defendant asserts the instruction was improper because the demand to take the blood test violated both his Fourth and Fifth Amendment rights, and because his refusal to submit could not constitutionally be used against him.

The Fifth Amendment claim is without merit, because the evidence was not testimonial but physical. (*People* v. *Collie* (1981) 30 Cal.3d 43, 55, fn. 7 [177 Cal.Rptr. 458, 634 P.2d 534, 23 A.L.R.4th 776].) The Fourth Amendment claim might require more scrutiny on a better record, but the record does not explain whether defendant refused to take the blood test for reasons within the scope of the Fourth Amendment. (Cf., e.g., *Tucker* v. *Dickey* (W.D.Wis. 1985) 613 F.Supp. 1124; *Storms* v. *Coughlin* (S.D.N.Y. 1984) 600 F.Supp. 1214; see *Schmerber* v. *California* (1966) 384 U.S. 757 [16 L.Ed.2d 908, 86 S.Ct. 1826].) Defendant fails to establish that he exercised a protected right, and we must therefore reject his claim.

### 2. *Proximate Cause.*

Defendant contends the court erred when it refused to give his modified jury instruction that if the medical care Gardner received after the assault was so inadequate that it amounted to the sole cause of his death, then he was not the proximate cause of Gardner's killing and was not liable for it.

The question of the quality of the medical care given Gardner was barely explored during the evidentiary phase of the trial; discussion of the point appears to have been limited to a few comments by Dr. Donald Trunkey, chief of surgery at San Francisco General Hospital. A fair reading of Dr. Trunkey's testimony is that Gardner was very close to death minutes after the stabbing. He testified that a medical technician did all he could with limited resources at the scene, but that the prison clinic could have done

more to try to save Gardner, who was "salvageable." The clinic tried to resuscitate Gardner by the wrong means.[8]

The court gave an instruction based on a modified version of CALJIC Nos. 8.55 and 8.57 (4th ed. 1979 rev.). Saying "That's all we are interested in," the court stated that the important language was CALJIC No. 8.57's advice that "the fact that the immediate cause of death was the medical or surgical treatment administered or that such treatment was a factor contributing to the cause of death will not relieve the person who inflicted the original injury from responsibility." The jury heard that language, together with other material from CALJIC Nos. 8.55 and 8.57: "The word 'proximate cause of a death' is a cause which, in natural and continuous sequence, produces the death, and without which the death would not have occurred," and when "the original injury is not a proximate cause of the death and the death was proximately caused by . . . medical or surgical treatment or some other cause, then the defendant is not guilty of an unlawful homicide."

Defendant contends the instructions failed to alert the jury that it must decide whether the possibly substandard treatment of Gardner was foreseeable. We disagree: in our view, the court adequately explained the law in light of the evidence.

 If a person inflicts a dangerous wound on another, it is ordinarily no defense that inadequate medical treatment contributed to the victim's death. (*People* v. *McGee* (1947) 31 Cal.2d 229, 243 [187 P.2d 706]; *People* v. *Dilworth* (1969) 274 Cal.App.2d 27, 33 [78 Cal.Rptr. 817]; *People* v. *Clark* (1951) 106 Cal.App.2d 271, 277-278 [235 P.2d 56].) To be sure, when medical treatment is grossly improper, it may discharge liability for homicide if the maltreatment is the sole cause of death and hence an unforeseeable intervening cause. (*People* v. *McGee, supra*, 31 Cal.2d at p. 240; see also *People* v. *Calvaresi* (1975) 188 Colo. 277 [534 P. 2d 316, 319]; State v. *Jacobs* (1984) 194 Conn. 119 [479 A.2d 226, 230]; Annot., Homicide: Liability Where Death Immediately Results From Treatment or Mistreatment of Injury Inflicted by Defendant (1965) 100 A.L.R.2d 769, 786.) But here the record is devoid of any evidence of grossly improper treatment. Our examination of the record discloses that Gardner's treatment may have been inadequate, but that the prison facilities may well have made a much different course of treatment difficult or impossible. As a matter of

---

[8]In addition, there was testimony that an ambulance could have been used to take Gardner to the hospital, but he was not taken there. Defendant also contends that a device used to administer oxygen forced more blood out of Gardner's heart, weakening his condition; but a close reading of the testimony of Dr. Trunkey on this point reveals that the device caused an increase in the flow of blood out of the heart to the brain, rather than from Gardner's wounds, one of which was in the heart.

law, the treatment regimen shown by the record fails to constitute a supervening cause of Gardner's death. (*People* v. *McGee, supra,* 31 Cal.2d at p. 243.) The jury need not be instructed on a theory for which no evidence has been presented. (*People* v. *Carter* (1957) 48 Cal.2d 737, 758 [312 P.2d 665].)

 To be sure, the instruction defining proximate cause contained language virtually identical to that of BAJI No. 3.75 (7th ed. 1986), which we disapproved in *Mitchell* v. *Gonzales* (1991) 54 Cal.3d 1041 [1 Cal.Rptr.2d 913, 819 P.2d 872]. But our disapproval of BAJI No. 3.75 does not aid defendant. In the main, in *Mitchell* we criticized the instruction as placing undue emphasis on physical or temporal nearness. (54 Cal.3d at pp. 1050-1051.) Thus, as the People observed at oral argument, any such confusion on the jury's part could only benefit defendant.

Of more concern in this case is our observation in *Mitchell* that the instruction may be grammatically confusing and that the hearer may misunderstand the term or substitute another meaning for it. (54 Cal.3d at p. 1051.) The civil instruction's infirmity is equally great in criminal cases. But any such risk in this case was, in our view, greatly diminished by the court's instruction that if medical treatment was the proximate cause of Gardner's death, then defendant was not liable for it. In any event, the foregoing discussion is of general application only, for we have explained that the record contains no evidence establishing a possibly supervening cause of Gardner's death.

Defendant also contends his federal due process rights were violated when the instruction relieved the jury of the obligation to find the proximate-cause element of the crime. We reject this claim for the reason previously given: there was no evidence of grossly improper care on which defendant's desired instruction could be predicated; therefore, due process was not violated.

### 3. *Prosecution Witnesses' Credibility.*

 Defendant contends the court erred by not modifying CALJIC No. 2.20 (4th ed. 1980 rev.) as he requested. That instruction reminds jurors to consider witnesses' possible bias, interest, or other motive for giving testimony. Defendant would have had the court specify that the jury must also consider the state's specific promises and payments to certain prosecution witnesses in evaluating credibility.

Defendant's requested instruction would have been too argumentative. "A criminal defendant is entitled, on request, to an instruction 'pinpointing' the

theory of his defense. (*People* v. *Wright* (1988) 45 Cal.3d 1126, 1137 [248 Cal.Rptr. 600, 755P. 2d 1049]; *People* v. *Sears* (1970) 2 Cal.3d 180, 190 [84 Cal.Rptr. 711, 465P. 2d 847].) As we recently explained, however, instructions that attempt to relate particular facts to a legal issue are generally objectionable as argumentative (*Wright, supra,* at p. 1137), and the effect of certain facts on identified theories 'is best left to argument by counsel, cross-examination of the witnesses, and expert testimony where appropriate.' (*Id.* at p. 1143.)" (*People* v. *Wharton* (1991) 53 Cal.3d 522, 570 [280 Cal.Rptr. 631, 809 P.2d 290].) Here the defense ably attacked the witnesses' credibility throughout the trial, which was the proper place to emphasize the state's promises and payments.

### 4. *Defendant's Decision Not to Testify.*

■ Defendant contends the court erred by giving an unmodified reading of CALJIC Nos. 2.60 and 2.61 over his objection. Those instructions told the jury to draw no inference from or discuss a defendant's failure to testify in his or her own behalf. Defendant desired a modification that would have alerted the jury to a particular reason for such a failure: fear or nervousness. It is true that *Griffin* v. *California* (1965) 380 U.S. 609, 613 [14 L.Ed.2d 106, 109, 85 S.Ct. 1229], mentions fear as a reason that might lead an innocent person to decline to testify. Nevertheless, there are other reasons why a defendant might avoid the stand, including the possibility that his or her testimony might reveal evidence of guilt. We see no reason to require a court to outline every hypothetical reason for a defendant's failure to testify: such comments may be left for a defendant's closing argument if counsel desires to explain the matter further.

With regard to defendant's contention that no such instruction should have been given if not his, *People* v. *Molano* (1967) 253 Cal.App.2d 841, 847 [61 Cal.Rptr. 821, 18 A.L.R.3d 1328], is no longer good law insofar as it concludes that the giving of the instruction over a defendant's objection constitutes a comment proscribed by *Griffin* v. *California, supra,* 380 U.S. 609, 614 [14 L.Ed.2d 106, 109]. The United States Supreme Court has since held to the contrary. (*Lakeside* v. *Oregon* (1978) 435 U.S. 333, 338-340 [55 L.Ed.2d 319, 324-325, 98 S.Ct. 1091].) Nevertheless, the purpose of the instruction is to protect the defendant, and if the defendant does not want it given the trial court should accede to that request, notwithstanding the lack of a constitutional requirement to do so.

We decline to find prejudice in the court's giving of the admonition over defendant's objection, however. We must assume that the jury followed the admonition not to take into account defendant's failure to testify. Under that

view, it is inconceivable that the giving of the instruction led to a less favorable outcome for defendant. Therefore, under any standard of review the error was not prejudicial.

### C. *Liability for the Killing of Officer Patch.*

At trial, defendant moved for a judgment of acquittal on the charge of the murder of Officer Patch, on the ground there was insufficient evidence of his criminal liability for that death. The court denied the motion. Defendant now contends there was insufficent evidence to find him liable for the first degree murder of Patch. He also contends the jury was incorrectly instructed on the issue.

As will appear, we conclude there was sufficient evidence for the jury to find that defendant's act was the proximate cause of the murder of Patch. But the instruction removed the element of proximate cause from the jury's consideration, an error of constitutional magnitude that requires reversal under United States Supreme Court precedent. We therefore reverse defendant's conviction for that murder.

Relying in part on *In re Joe R.* (1980) 27 Cal.3d 496, 504 [165 Cal.Rptr. 837, 612 P.2d 927], *People* v. *Harrison* (1959) 176 Cal.App.2d 330, 336 [1 Cal.Rptr. 414], *People* v. *Lewis* (1899) 124 Cal. 551, 555-556 [57 P. 470], and *People* v. *Button* (1895) 106 Cal. 628, 629-635 [39 P. 1073], the prosecution persuaded the court that if defendant caused Gardner to lose his faculties and stab Patch impulsively or unreasoningly, Gardner's blow was a dependent intervening act for which foreseeability was not required. (See also Perkins & Boyce, Criminal Law (3d ed. 1982) pp. 796-797 (hereafter Perkins & Boyce); Focht, *Proximate Cause in the Law of Homicide—With Special Reference to California Cases* (1938) 12 So.Cal.L.Rev. 19, 33 (hereafter Focht).) The court read the following instruction: "A defendant is the proximate cause of the death of another even though the immediate cause of the death is the act of a third person, if the third person is no longer a free moral agent as the direct result of the defendant's unlawful act. [¶] A defendant who, in conscious and reckless disregard for human life, intentionally and unlawfully inflicts an injury upon a third person is criminally responsible for the acts of that person while in delirium or a similar state of unconsciousness where such condition is the direct result of the defendant's unlawful act. [¶] *It is immaterial that the defendant could not reasonably have foreseen the harmful result. . . .* [¶] If the evidence establishes that, at the time of the assault upon Albert Patch, Charles Gardner was unconscious due to hypovolemic shock caused by the unlawful act of a defendant, he was not

a free moral agent and the defendant is responsible for his act." (Italics added.)[9]

The precise causation question may be posed as follows: what is the liability of *A* for an assault on *B* that deprives *B* of his reason and causes him to attack *C*, who lies some distance away? The authorities cited above do not consider this situation. Nor has our own or the parties' research divulged any case that does.[10]

■ The object of the criminal law is to deter the individual from committing acts that injure society by harming others, their property, or the public welfare, and to express society's condemnation of such acts by punishing them. "The purpose of the criminal law is to define socially intolerable conduct, and to hold conduct within . . . limits . . . reasonably acceptable from the social point of view." (Perkins & Boyce, *supra*, at p. 5, fn. omitted.) "Modern penal law is founded on moral culpability. The law punishes a person for a criminal act only if he is morally responsible for it. To do otherwise would be both inhumane and unenlightened. As was said in Holloway v. United States, 80 U.S.App.D.C. 3, 5, 148 F.2d 665, 666, 'Our collective conscience does not allow punishment where it cannot impose blame.' " (*United States* v. *Fielding* (D.D.C. 1957) 148 F.Supp. 46, 49, fn. omitted.)

■ Of course, moral culpability is found in homicide cases when, despite the lack of any intent to kill, the consequences of the evil act are so natural or probable that liability is established as a matter of policy. Thus, for

---

[9]The jury was told that only if Gardner was a free moral agent should it undertake a foreseeability analysis. The jury found that "Gardner was unconscious due to hypovolemic shock or similar cause" and rejected the option that he was a free moral agent.

[10]*In re Joe R.*, *supra*, cited *People* v. *Washington* (1965) 62 Cal.2d 777, 782 [44 Cal.Rptr. 442, 402 P.2d 130], for the proposition that "one may be a murderer when, with conscious disregard for life, he or his accomplice does an intentional act likely to cause death, even when the actual killing is accomplished by another." (27 Cal.3d at p. 504.) But *Washington* made that point in discussing old cases from other jurisdictions that involved either agency liability or the malice implicit in hostage taking. (62 Cal.2d at p. 782.) While the case may have been helpful to the prosecution's alternative theory that Gardner's was an independent intervening act, it does not aid our analysis, given the jury's contrary finding. *People* v. *Harrison*, *supra*, 176 Cal.App.2d 330, involved felony murder, a statutorily prescribed doctrine that is of no application here. *People* v. *Lewis*, *supra*, 124 Cal. 551, analyzed liability for death from concurrent causes, including the defendant's gunshot and the dependent intervening act of the victim's suicide, and also is inapposite. *People* v. *Button*, *supra*, 106 Cal. 628, discussed whether the defendant, having seriously injured and dazed the victim, could claim self-defense by endeavoring to retreat and killing the victim when the victim continued to advance. We held that the initial assailant must make his intention to withdraw known to the victim, and if the assault has made the victim incapable of understanding the assailant's desire to quit, then the assailant cannot claim self-defense as a defense to liability for killing the victim. (*Id.* at p. 634.) That case, too, is inapplicable to these facts.

example, the Legislature has chosen to designate certain felonies as so inherently dangerous that death in the course of their commission or completion constitutes first degree murder. (§ 189.) ■ Or, under the common law doctrine of transferred intent, if *A* shoots at *B* with malice aforethought but instead kills *C*, who is standing nearby, *A* is deemed liable for murder notwithstanding lack of intent to kill *C*. (See Perkins & Boyce, *supra*, at p. 924.) ■ And liability for second degree murder will attach if the circumstances of an act show express or implied malice, which latter mental state may be found "when the circumstances attending the killing show an abandoned and malignant heart" (§ 188). In other words, implied malice may be found when a defendant, knowing that his or her conduct endangers life and acting with conscious disregard of the danger, commits an act the natural consequences of which are dangerous to life. (E.g., *People* v. *Patterson* (1989) 49 Cal.3d 615, 626 [262 Cal.Rptr. 195, 778 P.2d 549].) Thus, to invoke a classic example, a person who fires a bullet through a window, not knowing or caring whether anyone is behind it, may be liable for homicide regardless of any intent to kill.

■ Likewise, principles of proximate cause may sometimes assign homicide liability when, foreseeable or not, the consequences of a dangerous act directed at a second person cause an impulsive reaction that so naturally leads to a third person's death that the evil actor is deemed worthy of punishment. The few cases on point find their foundation in the famous intentional tort case of *Scott* v. *Shepherd* (1773) 96 Eng.Rep. 525. Young Shepherd threw a lighted gunpowder squib into a crowded marketplace. The recipient threw it to another, who threw it to another, who threw it to Scott, another minor. Scott was partially blinded when the device exploded. The jury awarded Scott £100 and the court affirmed, holding that the chain of causation was not broken.

Our research discloses a few cases in the annals of American law that, following *Scott* v. *Shepherd*, *supra*, have found criminal liability for the death of a third party from the second party's impulsive reaction to the dangerous act. In those cases, physical proximity allowed the trier of fact to find the victim's death to be the natural and probable consequence of the defendant's violence and hence proximately caused by the defendant's act.

*Letner* v. *State* (1927) 156 Tenn. 68 [299 S.W. 1049, 55 A.L.R. 915] is prototypical. The defendant was angry about a theft and a burglary and decided to sink the boat that the miscreants, Walter and Alfred, were using to cross the Emory River. The defendant fired two shots at the boat; neither found its mark, but both landed within six feet. To save himself, Walter dove out, causing the boat to capsize. Both he and Alfred drowned. Defendant was

indicted for Alfred's murder; the jury found him guilty of involuntary manslaughter.

The Tennessee Supreme Court upheld the conviction. Citing, inter alia, *Scott* v. *Shepherd, supra,* 96 Eng.Rep. 525, the court concluded, "By firing the gun the defendant caused Walter . . . to take to the water, resulting in the overturn[ing] of the boat and the drowning of Alfred." (156 Tenn. at p. 76 [299 S.W. at p. 1051].) "[W]e are of the opinion that the wrongful act of the defendant . . . was the primary proximate cause of their death; that the act of Walter . . . in capsizing the boat was the natural result of the wrongful act of defendant, and renders the latter liable for their consequential death." (*Id.* at p. 80 [299 S.W. at p. 1052].)

As alluded to above, the key fact in *Letner* v. *State,* as in *Scott* v. *Shepherd,* both *supra,* was that the eventual victim was physically close enough that the court could hold his death to be the natural and probable consequence of the defendant's act. The same circumstance accompanied another early case considering analogous facts. In *Belk* v. *The People* (1888) 125 Ill. 584 [17 N.E. 744], the defendants were alleged to have negligently allowed their team of horses to break loose on a narrow country lane. The team collided with a wagon in plain sight just ahead, causing that wagon's team of horses to panic and run away and thereby throwing the victim, a passenger, to her death. The court reversed the resulting manslaughter convictions on other grounds, but noted, "Between the acts of omission or commission of the defendants, by which it is alleged the collision occurred, and the injury of the deceased, there was not an interposition of a human will acting independently . . . or any extraordinary natural phenomena, to break the causal connection. It may be fairly said that what followed the colliding of the defendants' team with the wagon in which the deceased was riding, was the natural and probable effect of the collision . . . ." (125 Ill. at pp. 587-588 [17 N.E. at p. 745].)

The early cases' implicit rule that the ultimate victim's death must be the natural and probable consequence of the defendant's act was later given explicit currency in the context of tort liability, though on different analytical grounds. In the classic case of *Palsgraf* v. *Long Island R.R. Co.* (1928) 248 N.Y. 339 [162 N.E. 99, 59 A.L.R. 1253] (hereafter *Palsgraf*), defendant's employees negligently let a passenger's bundle of fireworks fall and explode at a train station. The shock of the explosion threw down some scales "many feet away" at the other end of the platform, striking the plaintiff. (248 N.Y. at p. 341 [162 N.E. at p. 99]; see Prosser, *Palsgraf Revisited* (1953) 52 Mich.L.Rev. 1, 2-3) (hereafter Prosser).) The majority concluded that there was no duty to protect a person so far removed that the harm was unforeseeable; the dissent declared that there was a duty toward the world at large

not to be negligent toward anyone (cf. Civ. Code, § 1714) but that limitations on this liability could be founded on a lack of proximate cause and the remoteness of the damage. (See Prosser, *supra*, at pp. 5-6.) While Prosser criticizes the majority for ignoring the duty rule, he asks rhetorically, "What is the true reason that so many of us feel that the case was correctly decided, and that Mrs. Palsgraf should not recover? . . . It is that what did happen to her is too preposterous. Her connection with the defendant's guards and the package is too tenuous; in the old language, she is too remote. The combination of events and circumstances necessary to injure her is too improbable, too fantastic . . . . [¶] If there is any middle ground between the restricted scope of the original risk on the one hand and the extreme lengths to which even direct causation may be carried out on the other, it must lie in some reasonably close connection between the harm threatened and the harm done." (*Id.* at p. 27.)

Focht would later lament that *Palsgraf*'s influence "has been negligible in the criminal law." (Focht, *supra*, 12 So.Cal.L.Rev. 19, 53.) In cases of constructive intent, the "better[] solution would be to apply the 'zone of danger' doctrine to the law of crimes." (*Id.* at p. 29.) But Focht is wrong: in fact, the courts, though using the terminology of natural and probable consequences, were applying a *Palsgraf*-type analysis before *Palsgraf*, and have continued to do so since. In *Wright* v. *State* (Fla.Dist.Ct.App. 1978) 363 So.2d 617, the defendant, driving one car, fired at an intended victim in another. The target "rapidly accelerated his car while 'ducking bullets' and ran over and killed a pedestrian." (*Id.* at p. 618.) The defendant was convicted of manslaughter following an instruction that "the victim's consequent injury [must be] a natural and probable consequence of the defendant's violence." (*Ibid.*) The court affirmed the judgment, finding sufficient evidence to sustain the conviction. (*Id.* at p. 619.) And in *Madison* v. *State* (1955) 234 Ind. 517 [130 N.E.2d 35], the court found implied malice and affirmed a conviction of second degree murder when the defendant threw a hand grenade at one Couch who, presumably impulsively, kicked it to another who was killed. "The fact that Couch kicked the grenade did not break the line of causation. *Scott* v. *Shepherd* [*supra*] . . . ." (234 Ind. at p. 525 [130 N.E.2d at p. 38].)

The criminal law thus is clear that for liability to be found, the cause of the harm not only must be direct, but also not so remote as to fail to constitute the natural and probable consequence of the defendant's act. Commentators and drafters have made this conclusion explicit. (Perkins & Boyce, *supra*, at p. 774; LaFave & Scott, Criminal Law (2d ed. 1986) Causation, p. 284 [the doctrine of transferred intent should not apply when *A*, standing in a lonely desert with *B*, shoots to kill *B* but instead kills *C*, who

lies unseen behind some sagebrush]; Model Pen. Code, § 2.03, subd. (2)(b) [when purpose or knowledge of a result is an element of an offense, the actor is not liable for an unintended or uncontemplated result unless, as relevant here, "the actual result involves the same kind of injury or harm as that designed or contemplated and is not too remote or accidental in its occurrence to have a . . . bearing on the actor's liability or on the gravity of his offense."].) Moreover, if one aim of the criminal law is to punish in proportion to moral culpability, little purpose is served by imposing the same punishment for direct but remote consequences of a violent act as for natural and probable direct consequences. ▮▮▮▮ ▮▮▮ We note that in each of the cases we have cited in this discussion the trier of fact has apparently subscribed to this view: the defendant was either charged with murder but found guilty instead of manslaughter (*Belk* v. *The People, supra,* 125 Ill. 584, 586 [17 N.E. 744, 745]; *Letner* v. *State, supra,* 156 Tenn. 68, 70-71 [299 S.W. 1049, 1050]; *Wright* v. *State, supra,* 363 So.2d 617, 618); or, in *Madison* v. *State, supra,* 234 Ind. 517, 521 [130 N.E. 35], with first degree murder and convicted of murder in the second degree.[11]

Here, following an instruction that foreseeability was not to be considered, the jury found defendant guilty of murder in the first degree for Gardner's killing of Patch. The questions are threefold: was there sufficient evidence to confer liability for first degree murder; was there sufficient evidence of proximate cause for any criminal liability to attach to defendant for Patch's death; and does the instruction regarding foreseeability require reversal of defendant's conviction?

▮▮▮ The first question need not long detain us. Liability for first degree murder cannot attach absent evidence of premeditation and deliberation or of other acts irrelevant to this discussion. (§ 189.) There is no evidence whatever that defendant contemplated the murder of Patch, much less premeditated and deliberated it. On that ground, the first degree murder conviction cannot stand, for we discern no other doctrine, such as felony murder or transferred intent, that would suffice to confer liability for that degree of murder in this case.

---

[11]In criminal law no less than in the law of torts we recognize that "when the proposed application of a very general theory of liability in a new context raises important policy concerns, it is especially important to face those concerns and address them openly." (*Moore* v. *Regents of University of California* (1990) 51 Cal.3d 120, 135 [271 Cal.Rptr. 146, 793 P.2d 479].) Doing so here requires that we acknowledge there is no bright line demarcating a legally sufficient proximate cause from one that is too remote. Ordinarily the question will be for the jury, though in some instances undisputed evidence may reveal a cause so remote that a court may properly decide that no rational trier of fact could find the needed nexus. (See Perkins & Boyce, *supra,* at p. 776; *Palsgraf, supra,* 248 N.Y. 339, 352-353 [162 N.E. 99, 103-104] [dis. opn. of Andrews, J.].)

The next question is whether the evidence permitted the jury to determine that defendant's acts were the proximate cause of Patch's death. We hold there was sufficient evidence of proximate cause for the jury to decide that liability attached for defendant's acts.

We have consumed much space explaining that if the eventual victim's death is not the natural and probable consequence of a defendant's act, then liability cannot attach. Shots that cause a driver to accelerate impulsively and run over a nearby pedestrian suffice to confer liability (*Wright* v. *State*, *supra*, 363 So.2d 617); but if the driver, still upset, had proceeded for several miles before killing a pedestrian, at some point the required causal nexus would have become too attenuated for the initial bad actor to be liable even for manslaughter, much less for first degree murder. It is a natural consequence that shots fired at a boat may cause a passenger to leap out and thereby cause another in the boat to drown (*Letner* v. *State*, *supra*, 156 Tenn. 68 [299 S.W. 1049]); but if the boat had capsized, floated some miles down the river and over a waterfall, and fallen on the head of another boater, the shooter probably would not be criminally liable for that boater's death.

After considerable reflection, however, we conclude that the evidence sufficed to permit the jury to conclude that Patch's death was the natural and probable consequence of defendant's act. This is so because Patch was in the area in which harm could foreseeably occur as a result of a prison stabbing. Defendant mortally wounded Gardner, but the latter nevertheless was able to seize a knife that an assailant had left on the floor. As the jury found, the attack left Gardner in a daze, without the ability to reason or calculate. In that condition he staggered up a flight of stairs to the second floor in pursuit of defendant's accomplice Menefield. There he engaged in a purely reflexive struggle with Patch and plunged the knife into him. It is foreseeable that a wounded inmate might try to arm himself with a weapon abandoned at the scene of a prison melee and pursue his attackers a short distance. The jury was entitled to find that the distance Gardner pursued Menefield was not so great as to break the chain of causation.

As stated above, however, our inquiry does not end here. Because the jurors found that Gardner was unconscious when he attacked Patch, the instruction directed them not to consider whether the attack on Patch was foreseeable. Under that instruction, whether Patch was standing next to Gardner or half a mile away was not to be taken into account, as long as Patch's killing was the "direct result" of defendant's act.

As we have explained, the instruction incorrectly stated the law of proximate cause. A result cannot be the natural and probable cause of an act if the

act was unforeseeable. (See Perkins & Boyce, *supra*, at p. 824 [the abnormality of a response is an element to be considered in evaluating proximate cause].) An instruction that told the jury to disregard foreseeability would inevitably lead it to ignore the nature of Gardner's response to defendant's attack, and hence would substantially distract the jury from considering the causation element of the offense—an element that was very much at issue in the case. The instructional error thus cannot be said to have been harmless beyond a reasonable doubt (*Chapman* v. *California, supra,* 386 U.S. 18) and defendant's conviction of the murder of Patch must be reversed.[12]

### D. *Lying-in-wait Guilt and Special-circumstance Findings.*

 It was undisputed at trial that Gardner was killed as he walked a gauntlet of inmates lounging against the walls of a corridor. The state did not present evidence that defendant concealed himself; according to its evidence he was standing in the hall waiting for Gardner, and attacked him from behind as he passed by. Evidence was also presented that defendant had been loitering in the hall for a few minutes before the attack.

Defendant submitted a written motion for a "judgment of acquittal" on the lying-in-wait special-circumstance allegation on the basis that no evidence of concealment had been introduced. Defendant also asked for a different instruction on lying in wait for special circumstance purposes that would have told the jury the murder must have occurred during the lying in wait or that the lethal acts flowed continuously from that time. The court denied the motion and, after the parties agreed on the language of the instruction, the court told the jury that "The term 'lying in wait' is defined as a waiting and watching for an opportune time to act, together with a concealment by ambush or some other secret design to take the other person by surprise. Concealment may manifest itself either by ambush or by the creation of a situation where the victim is taken unawares even though he sees his murderer. It is only a concealment which puts the defendant in a position of advantage from which it can be inferred that lying in wait was part of the defendant's plan to take his victim by surprise." To find defendant guilty of first degree murder, the murder must be immediately preceded by lying in wait. "The lying in wait need not continue for any particular period of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation." As for the lying-in-wait special circumstance, that allegation could be found true only if "(1) . . . the defendant intentionally killed the victim, and [¶] (2) . . . the murder took place during the

---

[12]Because we reverse, we need not address defendant's further contentions that the court removed from the jury's consideration the question whether Gardner, rather than someone else, stabbed Patch, and that the court accidentally stated there was a presumption Gardner was "unconscious" when in fact the proper presumption was that he was conscious.

period of time that the defendants were lying in wait, or the lethal acts began and flowed continuously from the point in time the lying in wait ended. [¶] Lying in wait is defined elsewhere in these instructions."

The jury found defendant guilty of first degree murder for the killing of Gardner, and also that the special circumstance of lying in wait was true.

Defendant contends there was insufficient evidence to support the lying-in-wait instructions, the verdict finding him guilty of the first degree murder of Gardner, or the finding of the lying-in-wait special circumstance (§ 190.2, subd. (a)(15)). He also contends the lying-in-wait special-circumstance statute as applied is unconstitutional because the only difference between his case and one in which a prisoner walked to another inmate's cell and stabbed him to death would be locomotion; yet the hypothetical inmate would not be death-eligible on that basis. This scheme, defendant contends, violates the federal Constitution's prohibition against cruel and unusual punishment, because it cannot be applied in a principled manner to distinguish cases meriting death from those that do not. (*Godfrey* v. *Georgia* (1980) 446 U.S. 420, 427, 433 [64 L.Ed.2d 398, 409-410, 100 S.Ct. 1759].)

In *People* v. *Morales* (1989) 48 Cal.3d 527, 553-556 [257 Cal.Rptr. 64, 770 P.2d 244], a majority held that a jury was properly instructed that to find a defendant guilty of first degree murder on a theory of lying in wait, physical concealment was not required; it was enough to take the victim unawares even though she saw her attackers. (*Id.* at p. 555.) With regard to the special circumstance finding, we concluded that section 190.2, subdivision (a)(15), was constitutionally sound because it meaningfully distinguished between other forms of premeditated murder as long as the murder was committed under circumstances that included "(1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage . . . ." (48 Cal.3d at p. 557.) Again, no physical concealment is required. (*Ibid.*)

Given the evidence of the events that preceded the killing of Gardner, the instruction, verdict, and finding met the statutory requirement of section 190.2, subdivision (a)(15), that the murder occurred "while lying in wait." (*People* v. *Morales, supra,* 48 Cal.3d at p. 558.) The holding in *Morales* also defeats defendant's constitutional argument.

E. *Jury-based Claims of Error.*

1. *Soliciting Jury's Opinion Regarding Ill Juror's Discharge.*

The jury was about to resume deliberating after a weekend recess when the court and parties learned that a juror was ill with a sore throat and high

blood pressure. The weather was poor and the juror was afraid of contracting pleurisy. She said she might be able to return in three days.

The prosecution suggested replacing the juror with an alternate because there was no "real assurance at the end of those three days . . . that she would be with us." Defendant's counsel wanted to discuss the problem with his client before taking a position, but preliminarily felt it better to wait for three days because otherwise the jury would have to start deliberations anew. Everyone agreed to inform the jury of events, but defendant's counsel said, "I don't want the jury to think they are controlling whether an alternate is picked or not." The court then said, without opposition, "Let them tell us what they want to do." After the court explained the situation, the jury conferred, apparently only momentarily, before announcing it wanted an alternate sworn. At this point defendant's counsel told the court that one juror had reservations about a verdict that the jury had reached and might want to change his or her mind. Neither the parties nor the court knew the verdict or the juror at that point, but defendant's counsel worried that "If this, perhaps, is the one juror who had some reservations, or had some doubt in the case, perhaps the jury's only decision is influenced by that as well. I think the court can consider that in making its decision to seat an alternate." After a recess, defendant's counsel conceded there was statutory good cause to replace the juror with the alternate, but formally objected to her replacement on the sole ground that too much time had already been spent on deliberations.

The court found that the alternate should be seated, because of the original juror's illness and "having discussed this with the jury to see what they preferred to do . . . ." The next day, with the alternate juror seated, the jury found defendant guilty.

Defendant later discovered that the replaced juror was indeed the one who had had reservations. He submitted an affidavit in which that juror declared she had originally voted for conviction but changed her mind because she had doubts whether prosecution witnesses had been truthful. Her affidavit implied the 11 other jurors were displeased with her doubts. She declared she would like to have continued on the panel had the court let her do so.

 Defendant now contends the court erred in inviting the jurors' opinion and in essence allowing the jury to remove the one recalcitrant juror, thus hastening a unanimous verdict. We find no error.

A juror may be replaced if ill. (§ 1089; see also former § 1123, in effect at the time of the ruling.) The language of the statute then in effect, as

well as that of section 1089 today, makes clear that the decision to replace an ill juror with an alternate is discretionary. The court's discretion is not unbounded: it must determine whether good cause exists to discharge the juror, and its reasons for discharge must appear in the record as a demonstrable reality. (*People* v. *Collins* (1976) 17 Cal.3d 687, 696 [131 Cal.Rptr. 782, 552 P.2d 742].) Here the court did its duty by telephoning the ill juror, discussing the matter on the record with counsel, and stating its reasons. (See *People* v. *Lanigan* (1943) 22 Cal.2d 569, 577-578 [140 P.2d 24, 148 A.L.R. 176].) Hence there was no abuse of discretion in its ruling that good cause existed to discharge the ill juror. For that reason, we are unable to find error. Nevertheless, we caution that trial courts must not permit jurors to exercise any control over the composition of the jury. That function is reserved exclusively for the trial court.

### 2. Failure to Record Discussion of Jury Note.

 Defendant also asserts that ambiguity in the record regarding the disposition of a jury inquiry deprived him of his right under state law to have the proceedings recorded and to have the inquiry answered in his or his counsel's presence. He also contends he was deprived of an appeal based on a proper record, a flaw that violated his due process and Eighth Amendment rights under the federal Constitution.

The court reporter was not present when the jury sent out four inquiries regarding its duties during deliberations. Three inquiries were made during penalty-phase deliberations and are discussed *post*, at part III.J. Settlement proceedings conducted years after trial failed to establish what the jury was told in the case of three of the notes, including the note relevant to the following discussion.

As relevant in this guilt phase discussion, the jury sent out a note stating that the jurors wanted to "have the verdict form on 1st degree murder clarified concerning step 2." Because the note referred to first degree murder, it is most likely that the jury was wondering about the meaning of the following option on the verdict form, which it answered affirmatively: "(2) The defendant has has not in this proceeding been convicted of more than one offense of murder in the first or second degree in violation of Penal Code Section 190.2(a)(3)." (Words stricken in original as returned by jury.) There is no record of the response, if any, to this question. It is not even apparent that defense counsel saw the inquiry.

The court erred under state law by not having the proceedings, if any, reported in open court in the parties' presence. (Cal. Rules of Court, rule

39.5(c); see also § 190.9 [operative July 1, 1990]; *People* v. *Morris, supra,* 53 Cal.3d 152, 210, fn. 11.) If it failed to answer the inquiry in the presence of or after notice to defendant's counsel or defendant himself, it also erred as a matter of state law. (§ 1138.) Any error under section 1138, however, is subject to the prejudice standard of *People* v. Watson, *supra,* 46 Cal.2d 818, 836 (*People* v. *Ainsworth* (1988) 45 Cal.3d 984, 1020 [248 Cal.Rptr. 568, 755 P.2d 1017]), and we believe the same rule should apply to the failure to have the proceedings reported. In *People* v. *Chessman* (1950) 35 Cal.2d 455, 462 [218 P.2d 769, 19 A.L.R.2d 1084], a case analogous because the reporter's notes were incomplete, we held that the defendant bore the burden of showing prejudice because of a consequential omission. Here as there, "Examination of the record in light of defendant's claims discloses that it is adequate to permit us to ascertain whether there has been any miscarriage of justice." (*Ibid.*) We find no such miscarriage. We cannot agree that defendant has shown that the lapse—if any occurred other than a failure to include the reporter in the discussion—resulted in a reasonable probability of a less favorable outcome for him. The jury completed the verdict form, and we must conclude the matter was resolved to its satisfaction.

Defendant also raises federal due process and Eighth Amendment claims that the failure to record the proceedings deprived him of a right to a meaningful appeal. We need not decide the scope of those rights in this discussion, however, for defendant has cited no authority that would require reversal per se, and it is plain that the court's failure to preserve the record of the discussion of and answer to the inquiry, if any, was harmless beyond a reasonable doubt. (See *People* v. *Moore* (1988) 201 Cal.App.3d 51, 58 [248 Cal.Rptr. 31].) Nor do we perceive a defect of such a magnitude that defendant's Eighth Amendment right to reliability in the fact-finding process was implicated. The cases defendant cites do not persuade us to the contrary.

F. *Cumulative Effect of Errors.*

 Defendant contends that while "[d]eath penalty trials are too complex to be perfect," and he "does not claim that the state must be judged by a standard fit only for deities," he nevertheless was entitled to no less than a fair trial. We agree. We nevertheless conclude that with the exception of the conviction of the murder of Patch and the multiple-murder special circumstance, there is no reason to disturb the jury's findings regarding defendant's guilt. Each of the other errors discussed above was harmless in itself, and on this record the whole of them did not outweigh the sum of their parts. We find their cumulative effect too slight to warrant reversing the remainder of the judgment of guilt.

### III. PENALTY PHASE ISSUES

#### A. *Effect of Reversal of the Patch Conviction.*

 Defendant contends that if we reverse his conviction of the murder of Officer Patch and invalidate the accompanying multiple-murder special circumstance, we must remand his case for a new penalty trial. The question is close, but we disagree.

We have determined that defendant's conviction for the murder of Patch must be reversed for instructional error, and that the accompanying multiple-murder special circumstance must be invalidated. The question thus is whether there is a reasonable possibility the jury would have recommended a sentence of life imprisonment without possibility of parole for Gardner's murder alone. (See *People* v. *Brown* (1988) 46 Cal.3d 432, 448 [250 Cal.Rptr. 604, 758 P.2d 1135].) After careful consideration we conclude there is no reasonable possibility that the jury would have recommended the lesser sentence.

First and most significant, the jury recommended a sentence of death for the murder of Gardner and the violation of section 4500, but of life imprisonment for the murder of Patch. It is clear that the jury attached greater moral significance to defendant's murder of Gardner than it did to the subsequent death of Patch. Defendant's acts were the direct cause of that murder; his liability for that killing is unaffected by our discussion of proximate cause.

Second, the instruction required the jury, in fixing the penalty for the murder of Gardner, to take into account "all of the evidence . . . received during any part of the trial of this case[,]" including "The circumstances of the crime . . . and the existence of any special circumstances found to be true." Thus in evaluating defendant's moral culpability for the killing of Gardner, the jury was to take into account the evidence that Patch also was killed as a result of the melee. Although the jury would not have been able to take into account the multiple-murder special circumstance, we find that difference to be relatively minor in light of the other special circumstances found true. The jury would have had before it the special circumstances of lying in wait and of a previous conviction of first degree murder—the offense for which defendant was in prison when he killed Gardner. While we are reluctant to ascribe too much emphasis to the lying-in-wait special circumstance, we do not believe it is reasonably possible that the jury would have decided to vote for life imprisonment without possibility of parole absent defendant's conviction for Patch's murder. The jury would still have

been faced, at the penalty phase, with a defendant who had personally killed another inmate, whose acts in concert with those of Menefield had led to the death of a prison guard, and who was already serving time for the killing of a high school security guard. For defendant's sentence to be reversed there must be a *reasonable* possibility—not just any possibility—that the outcome would have been more favorable to him. We see no such reasonable possibility, and therefore decline to reverse the penalty judgment on this ground.

B. *Severance of Penalty Phase Proceedings.*

Before the penalty phase began, defendant moved to sever his penalty trial from Menefield's, either by bringing in two new juries for separate penalty trials or at least one new jury for separate trials. The motions were denied. Defendant argues the court abused its discretion under state law and infringed on his federal constitutional rights when it refused to sever the penalty phase of his trial from that of Menefield. We disagree.

Defendant asserts that six witnesses appeared against Menefield and twenty-four against him, each different. He argues the lack of cross-admissible evidence mandated a severed trial, given the heightened scrutiny accorded to severance motions in capital cases. (*People* v. *Smallwood* (1986) 42 Cal.3d 415, 425-429 [228 Cal.Rptr. 913, 722 P.2d 197].) But the court did not abuse its discretion (§ 1098; *People* v. *Floyd* (1970) 1 Cal.3d 694, 720 [83 Cal.Rptr. 608, 464 P.2d 64]), particularly in light of the undisputed statutory preference for a joint penalty trial following a similar trial of guilt (§ 190.4). Nor do we agree with defendant that the prosecutor improperly sought to portray Menefield as the lesser offender. The prosecutor excoriated both defendants as wretched human beings; he did not spare Menefield in the least. Moreover, if at times the prosecutor had less critical things to say about Menefield than about defendant, it was because defendant was the worse offender: there was testimony he was the actual stabber of Gardner, and defendant, a convicted murderer, also had a more violent past than did Menefield, who was in prison for lesser though serious crimes. The verdict shows that the jury carefully weighed the culpability of each defendant and found defendant more blameworthy, but took care to discriminate among the charges on which defendant was convicted, deciding that he should be executed for the murder of Gardner and for the violation of section 4500 but should receive life imprisonment without possibility of parole for Patch's death. This was not a jury that the record reveals to have been swayed by anything other than the relative culpability of each defendant.

Defendant also contends that the court's refusal to sever the penalty proceeding violated his constitutional right to an individualized determination of culpability. (*Zant* v. *Stephens* (1983) 462 U.S. 862, 879 [77 L.Ed.2d

235, 251, 103 S.Ct. 2733].) We disagree. The jury's careful consideration of its penalty verdict, and the record as a whole, demonstrate that defendant received such a determination.

### C. *Issues Regarding Testimony of Inmates Acker and Rooks.*

#### 1. *Facts.*

The prosecution notified the defense before the case was called for trial that it would summon inmates Rooks and Acker at the penalty phase to testify about two stabbings defendant allegedly committed—evidence for the prosecution's view that defendant was not fit to live. Prior to trial, defendant asserted a right under section 190.3 to be provided, before the case was called, with a statement of the expected testimony. The prosecution offered to make Acker, then in an out-of-state prison under a witness-protection program, available for questioning in California a week or two before the penalty phase began. The court approved this arrangement and, keeping Acker's whereabouts confidential, refused defendant's request to be allowed to visit Acker where he was confined.

Defendant continued to press his demand for Rooks's and Acker's testimony before the penalty phase began. The prosecution did not interview Rooks or Acker—who had said they did not wish to speak to defendant's counsel—until the Friday before the Monday on which the penalty phase began. The prosecutor then turned his notes of the interviews over to the defense, thereby, in his view, exceeding his obligation of disclosure. The court denied defendant's apparent motion to exclude Rooks's and Acker's testimony for want of compliance with section 190.3. At trial Acker testified that defendant had stabbed him; Rooks described defendant's stabbing of another inmate, Fuzzell, who was unavailable to testify.

At an in camera hearing held before the penalty phase to discuss Acker's availability for interview by defendant's counsel, the prosecutor mentioned that Acker had informed on fellow inmates 12 times and was liable to be killed if returned to California for very long. This information was not provided defendant for possible impeachment use in the penalty phase.

#### 2. *Right to Substance of Testimony.*

Defendant first asserts that he had a right both as a matter of state law and under the Sixth Amendment to know the substance of Rooks's and Acker's testimony before the case was called for trial.

Under section 190.3, the prosecution must furnish the defense with notice of evidence in aggravation "within a reasonable period of time as determined

by the court, prior to trial." Section 190.3's plain language gives the court discretion to determine what amount of notice is reasonable, but the evidence must be given to a defendant before the case is called. (*People* v. *Daniels* (1991) 52 Cal.3d 815, 879 [277 Cal.Rptr. 122, 802 P.2d 906].)

The statute does not require production of the evidence, however, but notice of it. (§ 190.3.) The prosecutor provided notice that Rooks and Acker would be called to testify about the stabbings. The defense was not entitled to a summation of the witnesses' expected testimony. There was no state law error. Nor was there any Sixth Amendment violation. (See *Pennsylvania* v. *Ritchie, supra,* 480 U.S. 39, 52-53 [94 L.Ed.2d 40, 54-55] [pretrial discovery request].)

### 3. *Failure to Inform Defense of Acker's Cooperation Record.*

 Defendant contends the prosecutor's failure to disclose to the defense Acker's record of having informed on others 12 times, including on his own wife, amounted to a violation of defendant's federal constitutional rights to due process, to confront adverse witnesses, and to be present at all stages of the proceedings. We conclude that no constitutional violation occurred.

Defendant testified he did not stab Acker, even though he candidly admitted having stabbed inmates Lynch and Fuzzell. If admissible, it is conceivable that Acker's record might have caused the jurors to wonder whether Acker had a grudge against inmates in general and would lie to harm defendant, or had a grudge against defendant in particular and saw an opportunity to use a stabbing committed by another inmate against defendant. The mere fact of his having informed on 12 different people might have caused the jury to wonder whether one person could reliably compile so much information on other inmates.

Nevertheless, such hypotheses do not rise to the level of constitutional cognizability. *United States* v. *Bagley, supra,* 473 U.S. 667, sets forth the standard of review applicable to defendant's claims of constitutional violations for failure to disclose favorable impeachment information. "The holding in *Brady* v. *Maryland* [(1963) 373 U.S. 83, 87] requires disclosure only of evidence that is both favorable to the accused and 'material either to guilt or to punishment.'" (*Id.* at p. 674 [87 L.Ed.2d at p. 489].) "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." (*Id.* at p. 682 [87 L.Ed.2d at p. 494]

(lead opn. of Blackmun, J.); accord, *id.* at p. 685 [87 L.Ed.2d at p. 496] (conc. opn. of White, J.).)

▆▆▆ Under the foregoing standard, there was no constitutional violation.[13] Other aggravating factors that weighed against defendant lead almost inescapably to our conclusion that the prosecution's shortcoming on this issue was not of sufficient magnitude to undermine confidence in the outcome of the case. In aggravation, the jury had found that defendant was the actual killer of Gardner and had been previously convicted of first degree murder. And defendant conceded he had attacked another inmate with intent to kill, though he argued he had desisted in the end and that the attack was in response to an attempt on his life. For the revelation of Acker's record to have made a material difference the jury would have had to conclude that as a result of that record (1) Acker was fabricating his testimony, and (2) the balance of other aggravating and mitigating factors was so close that absent proof of an assault on Acker defendant should be given a sentence of life imprisonment without possibility of parole. We believe such a concatenation of conclusions was unlikely in the extreme.

### D. *Evidence Regarding the Stabbing of Inmate Lynch.*

In 1977 defendant was charged with violating section 4500 (assault by a life prisoner likely to produce great bodily injury) for allegedly having stabbed Lynch. He pleaded not guilty, later withdrawing the plea and pleading guilty to possession of a concealed weapon (§ 12021). ▆▆▆ Defendant contends the court erred in failing to instruct the jury it must find beyond a reasonable doubt that he stabbed Lynch. But the record reveals that defendant waived the right, and defendant does not argue the waiver was ineffective. There remains the question whether, as defendant also argues, the statute of limitations or prohibitions against double jeopardy or the relitigation of adjudicated facts barred evidence of the stabbing. We have held they do not. (*People* v. *Douglas* (1990) 50 Cal.3d 468, 528-530 [268 Cal.Rptr. 126, 788 P.2d 640].)

---

[13]*Brady* v. *Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215, 83 S.Ct. 1194], which considered the constitutional impact of withholding exculpatory evidence favorable to a defendant, decided that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material . . . ." (*Id.* at p. 87 [10 L.Ed.2d at p. 218].) In *United States* v. *Bagley, supra,* the United States Supreme Court rejected the lower court's view that withholding impeachment evidence involved a more severe constitutional taint because it threatened a defendant's confrontation rights as well as the right to due process of law. (473 U.S. at pp. 676-678 [87 L.Ed.2d at pp. 490-492] (lead opn. of Blackmun, J.); accord, *id.* at p. 685 [87 L.Ed.2d at p. 496] (conc. opn. of White, J.).) We see no reason, therefore, to agree with defendant's contention that his confrontation rights were violated.

E. *Criminal Activity Suggesting Possible Future Violence.*

Two claims of error revolve around evidence the prosecution introduced or tried to introduce of "The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." (§ 190.3, factor (b).)

Defendant sought *in limine* to exclude evidence of two occasions in which metal objects were found in or removed from his cell toilet. The prosecution argued that both incidents implied criminal activity, and the court initially denied the motion.

### 1. *Evidence That Defendant Possessed a Piece of Metal in 1976.*

The prosecution introduced evidence that defendant had been seen hiding an unsharpened piece of metal in his toilet in 1976. The court told the jury it could consider the act in aggravation if it found beyond a reasonable doubt that defendant had hid the metal piece and its possession involved an express or implied threat to use violence. The jury so found. ▇▇▇ Defendant argues that in permitting the evidence to be introduced and instructing the jury it could be used in aggravation if proved beyond a reasonable doubt, the court violated state law and his Eighth Amendment right to "reliability in the fact-finding process" because it was not a crime to possess the object. We disagree.

There is no doubt that defendant's conduct constituted criminal activity. Defendant himself admitted on direct examination that the metal was a "weapon," but explained that he had no intent to keep it because it was destined for a prisoner in a higher tier. Defendant's admitted conduct and mental state rendered him liable for possession of a weapon (§ 4502).

There may be doubt whether the crime involved conduct making its commission admissible under the statute. We need not resolve this issue now, however, because any error in admitting the evidence was harmless given the strength of the other evidence properly admitted in aggravation.[14]

### 2. *Allegation of Having Weapon in 1975.*

In his opening statement the prosecutor mentioned an alleged 1975 incident in which a piece of metal was discovered missing from defendant's toilet. The object was never found and defendant moved to exclude any

---

[14]For the foregoing reasons, we disagree that the litigation over defendant's possession of the object violated an Eighth Amendment right to reliability in the fact-finding process.

testimony about its disappearance because the jury might speculate he had taken it for a forbidden purpose. The court agreed, changing its original ruling. After the presentation of evidence concerning the 1976 event, the prosecutor raised the matter of the excluded evidence of the 1975 event outside the jury's presence. He said, "the court has put me in an embarrassing situation where I have already made my opening statement on removing the metal from the sink [*sic*] . . . ." He again asked to introduce evidence of the item's disappearance; the court again denied the motion. Defendant now contends that he was prejudiced by the prosecution's reference to the uncharged incident in his opening statement.[15]

■■■ Preliminarily, we address the People's contention that the court erred in denying them the right to introduce evidence of the missing piece of metal. On this record we cannot agree. The People have not shown that the prosecution would have laid a foundation that the toilet was intact before defendant began to occupy the cell and that defendant was the only person who could have tampered with the toilet. Perhaps their witness, a prison guard, could have established the necessary facts, but we cannot assume so.

■■■ For his part, defendant contends the court erred in permitting the prosecution to mention, in his opening statement, a matter that would later be excluded. We disagree. The court was not asked to hold a hearing before the opening of the penalty phase to decide the admissibility of penalty phase evidence (see *People* v. *Phillips* (1985) 41 Cal.3d 29, 72, fn. 25 [222 Cal.Rptr. 127, 711 P.2d 423]). Nor, even had error occurred, would it have been prejudicial. The brief reference to an uncharged act in the midst of a long opening statement may have had some slight effect on the jurors, but the matter was never raised again and the jury was instructed it could consider in aggravation only crimes the prosecution had proved beyond a reasonable doubt. Moreover, defendant himself referred to uncharged incidents involving possession of a knife. Under these circumstances there is no reasonable possibility that the prosecutor's statement prejudiced defendant. (*People* v. *Brown, supra*, 46 Cal.3d 432, 448.) By comparison, in *Ex parte Whisenhant* (Ala. 1984) 482 So.2d 1247, on which defendant relies, the prosecutor opened his penalty case by stating that the defendant had robbed and murdered—allegations that were never taken up in the evidentiary phase. (*Id.* at p. 1248.)

Defendant also contends the prosecutor's reference violated his Eighth Amendment right to reliability in the fact-finding process. Because the

---

[15]The prosecutor said in his opening statement: "Then we have two other incidents, not of stabbings: but in October 1975, they discovered a piece of metal about ten inches long and an inch or so wide that had been carved out of his toilet which is made of metal, something you could make a weapon out of. Roberts did that. There was nothing wrong with that toilet when Roberts was moved into the cell."

reference was so unimportant, it cannot have had the effect defendant ascribes to it.

F. *Admitting Rebuttal Evidence of Defendant's Continued Gang Membership.*

On direct examination defendant had testified to his reformed character, including statements that he received his general education degree, took correspondence courses, and managed to impress the warden at San Quentin Prison that he had changed enough to merit a transfer to Tehachapi, with its "college campus" atmosphere.

On cross-examination the prosecution questioned defendant about BGF literature found in his cell. Defendant admitted that "Literature was found which was determined to be BGF, literature which some of I disagreed with."

The prosecution sought to call a retired Soledad Prison guard to introduce evidence that defendant had BGF plans or orders to take over Soledad. The prosecution learned of the alleged plan from the guard's report, which described the discovery of messages concerning the purported plan. After it became evident the original messages could not be found and the retired guard's memory about their content was dim, the trial court granted a motion to bar the guard's testimony. Thereafter, defendant continued to assert on cross-examination that although he had BGF literature he was trying to escape from the group.

Some days after defendant testified, the prosecution told him that the materials found in his Soledad cell had just been found and would be introduced if possible. Defendant moved to exclude the evidence solely on the basis that he had asked for any such materials two years earlier and had been told they did not exist. He argued that under section 190.3 he was entitled to pretrial notice that these materials would be introduced. The day before, a Monday, defendant had also objected to the prosecution's having purportedly discovered the items on the Friday before but not having notified him until that day. The prosecution thereupon delivered copies of some of the items to defendant's counsel on Monday night and gave him copies of the others before the hearing.

The court denied the section 190.3 motion, and the prosecution called a sergeant who testified he had found the materials in defendant's cell. One of the items was a "kite," or message, addressed to defendant. The prosecutor asked whether it was found during the search. Upon testimony that it was,

the prosecutor ended his inquiry. He did not seek to have the note's contents read to the jury. Shortly afterward the prosecution reviewed outside the jury's presence the items it wanted to introduce as penalty phase evidence. Defendant again objected to introduction of the evidence found in his cell on the ground that under section 190.3 he was entitled to notice of its introduction. The court denied the motion.

At closing argument, the prosecutor then read the contents of the note. "Now we also have—I suppose [defendant's counsel] might say, 'Gee, that's just sort of interesting Black Guerrilla literature.' Then we have these things, are called kites. . . . This one is real interesting. It contains code words. It contains code words like the code word for hit is to school him. To say 'school him,' means you are going to hit him. You can look at them here. The interesting thing is the address on the back, to the lieutenant [defendant], the institution enforcer. This was in Mr. Roberts' cell down in Soledad when he had long ago quit BGF." Defendant assigned misconduct after the prosecutor's argument ended; but the court, noting that the kite was in evidence, denied a motion to tell the jury to disregard the commentary.

 Defendant claims error in the introduction of the literary evidence and the other items found in his cell. First, he contends it was not evidence of conduct that demonstrates the commission of an actual crime. (*People* v. *Phillips, supra,* 41 Cal.3d 29, 72.) But clearly the evidence was offered in rebuttal to defendant's testimony that he had reformed and was trying to leave the BGF. Defendant also maintains the evidence was improper rebuttal because he had conceded its presence in his cell and because the introduction of the actual literature on rebuttal clearly exceeded the scope of direct. We disagree: again, defendant's direct testimony suggested an effort to improve himself and to leave the gang; the prosecution was entitled to ask whether a person striving for these goals would cache such literature in his cell.

 Next, defendant contends the evidence was substantially more prejudicial than probative. (Evid. Code, § 352.) But the defense did not object to its introduction on any ground other than lack of notice. As notice was not required for rebuttal evidence (§ 190.3), defendant cannot raise a claim of error on other state law grounds now. Nor, for the foregoing reasons, do we agree with defendant that his Eighth Amendment and due process rights were violated.

G. *Propriety of Content of Closing Argument.*

 Conceding that his counsel failed to object at the time, defendant contends we should reverse the judgment as to penalty because the prosecutor mentioned his lack of remorse, an improper comment when defendant

has maintained his innocence. We have held, however, that a claim of misconduct on that ground may not be made unless a defendant has objected at trial. (*People* v. *Wharton, supra,* 53 Cal.3d 522, 593.)[16] Defendant contends an objection would have been futile because at the time of trial there was no case law forbidding such commentary. We disagree: had the prosecutor's remark been as plainly improper as defendant now contends, prudence would have dictated an objection whether any law immediately came to mind or not. But there was no misconduct: the prosecutor did not argue that defendant felt no remorse for the deaths of Gardner and Patch, but rather that he lacked remorse for the death of Obidee Cowart, the security guard defendant admitted killing and for whose death he was serving time in prison.[17]

██ Defendant also contends the prosecutor committed misconduct in having a psychiatrist testify from a 1977 report that defendant had been "quite violent and his violence potential continues to be at least moderate in both [institutional and noninstitutional] situations," and then saying at closing argument that defendant "has kept up a continuous pattern of violence again and again and again" and was "committed to violence." Defendant objected to the psychiatrist's testimony on the ground that it improperly implied an expert's conclusion about defendant's future dangerousness, and the court struck it.[18] Of course it would have been improper for the prosecutor to refer in argument to the psychiatrist's testimony after the court had struck it, but the prosecutor's references to defendant's commitment to violence appear to have been based on

---

[16]Defendant also contends the prosecutor's comments violated an Eighth Amendment right to reliability of the determination that death is the appropriate punishment. For the reasons set forth herein, we disagree that any such right was violated.

[17]Defendant also contends the state never questioned him on cross-examination about whether he felt remorse. Hence, he reasons, the prosecutor's argument violated due process by subjecting him to a judgment of death on the basis of information he never had an opportunity to admit or deny. We disagree. The prosecutor was referring to the remorseless tenor of defendant's testimony as he described, on direct and cross-examination, the circumstances surrounding his killing of Cowart. The comments were permissible. (*People* v. *Wharton, supra,* 53 Cal.3d at p. 596.) Moreover, if defendant felt remorse he could have so stated on direct examination. Rather, he excused his conduct by saying he acted in self-defense.

[18]The People ask that we reconsider the question of the admissibility of testimony regarding future dangerousness under section 1252, which provides as relevant here: "On an appeal by a defendant, the appellate court shall, in addition to the issues raised by the defendant, consider and pass upon all rulings of the trial court adverse to the State which it may be requested to pass upon by the Attorney General."

Because we conclude, however, that any link between the stricken testimony and the outcome of this case is too tenuous to warrant reversal, we need not decide the issue. To do so would be to render an advisory opinion. Though the command of section 1252 is clear, under the state Constitution we have no power to give gratuitous advice (*Younger* v. *Superior Court* (1978) 21 Cal.3d 102, 119-120 [145 Cal.Rptr. 674, 577 P.2d 1014]), a prohibition that trumps the statute.

defendant's criminal record. As we read his argument, the prosecutor was asserting that defendant had maintained a continuous pattern of violence in the past and was not going to change his behavior. Any link with the stricken testimony about future dangerousness is entirely too tenuous to command reversal. (See *People* v. *Wharton, supra,* 53 Cal.3d at p. 594.)

H. *Multiple Counting of Aggravating Factors and Special Circumstances.*

■ Defendant argues that the trial court's reading of CALJIC No. 8.84.1, which tracks the language of section 190.3 (see, e.g., *People* v. *Morris, supra,* 53 Cal.3d 152, 224), misled the jury into thinking it could double-count aggravating acts, and that the jury was allowed to double-count defendant's conviction for multiple murders and the accompanying special circumstances.

We find no error. With regard to the double-counting of aggravating acts, we have held that the court has no sua sponte duty to modify the instruction absent misleading prosecutorial argument. (*People* v. *Siripongs* (1988) 45 Cal.3d 548, 583 [247 Cal.Rptr. 729, 754 P.2d 1306].) "[T]he prosecutor's argument focused on the evidentiary facts themselves and thereby allayed the danger that any particular fact would be counted in support of more than one factor." (*People* v. *Heishman* (1988) 45 Cal.3d 147, 186-187 [246 Cal.Rptr. 673, 753 P.2d 629].) As for defendant's contention that the jury was allowed to consider special circumstances more than once under factor (a) of section 190.3 (see *People* v. *Morris, supra,* 53 Cal.3d 152, 224), we have held that the trial court should, on request, admonish the jury not to consider multiple special circumstances more than once for exactly the same purpose in the penalty determination lest it lead to the result defendant asserts may have occurred here. (*Ibid.*) Defendant, however, did not request any admonition of the kind he now suggests should have been made. Nor do we see any misleading argument or "substantial likelihood of double-counting . . . ." (*Id.* at pp. 224-225.) Accordingly, reversal is not called for. (See *id.* at p. 225.) For these reasons, we cannot find the Eighth Amendment violation defendant perceives: nothing in the record suggests that any right to heightened reliability in the fact-finding process was infringed upon.

I. *Jury Instruction on Extenuating Circumstances.*

The court gave the jury a modified version of CALJIC No. 8.84.1: "In determining which penalty is to be imposed on each defendant, you shall consider all of the evidence which has been received during any part of the trial of this case. You shall consider, take into account, and be guided by the

following factors, if applicable: . . . [¶] (k) Any other circumstance, including the defendant's background, which extenuates the gravity of the crime even though it is not a legal excuse for the crime."

 Defendant contends the court precluded the jury from giving proper weight to aspects of his character and background that mitigated his offenses.

The United States Supreme Court has decided that the proper inquiry when a defendant contends an instruction is ambiguous to his or her detriment "is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." (*Boyde* v. *California* (1990) 494 U.S. 370, 380 [108 L.Ed.2d 316, 329, 110 S.Ct. 1190, 1198] [considering challenge to CALJIC No. 8.84.1].) It is inconceivable that under this instruction the jury could have cast aside the great amount of evidence defendant offered in mitigation. In *Boyde* the federal high court rejected a contention that an unadorned version of CALJIC No. 8.84.1, which, unlike the instruction here, did not refer to a defendant's background, deprived the jury of the ability to "give effect to evidence . . . of . . . [an] impoverished and deprived childhood, . . . inadequacies as a school student, and . . . strength of character in the face of these obstacles." (494 U.S. at p. 381 [108 L.Ed.2d at p. 330, 110 S.Ct. at p. 1198].) The instruction here gave the jury ample leeway to consider similar episodes in defendant's life. We find no error.

J. *Failure to Record Discussion of Notes; "Brown" Error.*

 Defendant asserts that the court committed *Brown* error (*People* v. *Brown* (1985) 40 Cal.3d 512 [220 Cal.Rptr. 637, 709 P.2d 440], revd. on other grounds *sub nom. California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837]) (hereafter *Brown*) in giving the admonition of former CALJIC No. 8.84.2: "If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose the sentence of death." In closing arguments both the prosecutor and defense counsel urged the jurors to determine the penalty as a moral assessment of defendant's personal culpability: the prosecutor urged death, and defendant's counsel urged life imprisonment. The prosecutor argued, for example, "You have looked at the facts and circumstances of this case. You have looked at the facts and circumstances of these two defendants and now it's your task to weigh it all and to decide what is appropriate." Nonetheless, the jury was moved to query, in a note sent out during deliberations, "Does 'shall impose' mean you have to or you can impose a penalty?" The

court, on the parties' agreement, replied, "The weight to be given any aggravating or mitigating circumstance is to be determined solely by you."[19]

"In *Brown* we held that section 190.3, as construed therein, was not unconstitutional. (40 Cal.3d at pp. 538-544.) In conformity with settled constitutional principles, we interpreted the statutory language to require jurors to make a moral assessment . . . of the character of the individual defendant and the circumstances of the crime and thereby decide which penalty is appropriate in the particular case. (*Id.* at pp. 540-541.)

"Although in *Brown* we upheld the constitutionality of section 190.3, we nevertheless recognized that when delivered in an instruction the provision's mandatory sentencing language might mislead jurors as to the scope of their sentencing discretion and responsibility. (40 Cal.3d at p. 544, fn. 17.) Specifically, a juror might reasonably understand that language to define the penalty determination as 'simply a finding of facts' (*id.* at p. 540) or 'a mere mechanical counting of factors on each side of the imaginary "scale" ' (*id.* at p. 541). A juror might also reasonably understand the language to require him [or her] to vote for death if he [or she] finds that the evidence in aggravation outweighs the evidence in mitigation—even if he [or she] determines that death is not the appropriate penalty under all the circumstances. (See *id.* at pp. 540-544)." (*People* v. *Bonin, supra,* 47 Cal.3d 808, 856.)

Applying this reasoning to the case at bar, we cannot conclude, after scrutiny of the record, that the jurors were misled by former CALJIC No. 8.84.2.

It is true, of course, that after having heard counsel's arguments, the jury still was impelled to ask the court whether it had discretion or not to impose the death penalty. The parties' summations thus should be regarded as having had no effect on the jury's understanding of its duty. Furthermore, the court's response that the weight to be assigned to each factor was to be determined solely by the jury was not entirely satisfactory, for it left open the possibility that the jurors might conceivably conclude that although they would determine the weight of each factor, the balancing of the total weights of the

---

[19]Defendant also contends the court erred under the Eighth Amendment and violated his federal due process rights, and erred under state law, in failing to have transcribed the record of its reply to the jury's inquiry. For the reasons stated earlier, we find error under state law. (See pt. II.E.2. in the guilt phase discussion, *ante.*) But we find no prejudice, for even though this inquiry was important, the answer given the jury is known, so that we can determine that there is no reasonable possibility the outcome would have been better for defendant had the proceedings been recorded. Nor, for the same reason, do we find any due process violation: with regard to this inquiry, the answer given the jury is known, and therefore defendant cannot claim he has been deprived of his right to a meaningful appeal. Defendant's Eighth Amendment claim similarly fails.

aggravating and mitigating factors was a mechanical exercise in which the jury would lack all discretion.

Nevertheless, we decline to find *Brown* error. For the reasons given in the preceding paragraph, in hindsight the court's answer may be viewed as essentially nonresponsive to the jury's question. But the jury's inquiry called for a specific response: did the jury have discretion to fix the penalty or did it not? The court did not tell the jury that it did not have such discretion. We believe a reasonable juror would have understood the court as replying in effect that he or she could impose a penalty of death but was not required to do so. The converse certainly cannot be deduced from the reply, and if the reply remained ambiguous in the jurors' minds, we believe they would have made further inquiry, which they did not. ▮ ▬ ▬ In sum, we believe the jurors were adequately told what they should do in fixing the penalty, and find no *Brown* error.[20]

### K. *Constitutionality of 1978 Death Penalty Statute.*

▮ Defendant contends that the 1978 law under which he was sentenced is unconstitutional because it lacks safeguards against arbitrary and random application, thereby violating his Eighth Amendment rights. But while defendant adverts to former Chief Justice Bird's dissenting comments on flaws in the 1977 death penalty law (*People v. Jackson* (1980) 28 Cal.3d 264, 352 [168 Cal.Rptr. 603, 618 P.2d 149]), with regard to the 1978 statute he "perfunctorily asserts the claim without argument in support." (*People v. Marshall* (1990) 50 Cal.3d 907, 945, fn. 9 [269 Cal.Rptr. 269, 790 P.2d 676].) Indeed, defendant concedes he is raising the point "in part to assure preservation of it for any future federal proceeding." The argument is

---

[20]Defendant contends the record also reveals no record of the response to the jury's questions, "Are the aggravating and mitigating circumstances for the assault on Gardner which resulted in death, the same as the ones considered with murder of Gardner?" and "What happens if the jury cannot reach a unanimous decision on one of the lesser charges? We cannot find any instructions to answer this."

Again, it was error for the court not to have a reporter present when the questions were asked in open court. (Cal. Rules of Court, rule 39.5(c); see also § 190.9 [operative July 1, 1990]; *People v. Morris, supra,* 53 Cal.3d 152, 210, fn. 11.) We doubt, however, that the jury received no response to the first inquiry; it appears both defense counsel initialed it and it is extremely unlikely the defense would have been satisfied with no response at all. The second inquiry was not initialed and we do not know if defendant's counsel saw it. Assuming, however, that the jury's question referred to unadjudicated prior offenses (there were no instructions on lesser charges at the penalty phase) and was not answered, the failure to do so was immaterial because there is no requirement of unanimity to find such an offense occurred. (*People v. Benson* (1990) 52 Cal.3d 754, 810-811 [276 Cal.Rptr. 827, 802 P.2d 330].) Moreover, these inquiries were not so consequential that the failure to record the answers constituted prejudicial error under state law, or deprived defendant of a meaningful appeal and thus materially implicated his federal due process rights.

therefore rejected as not properly raised. Moreover, we have rejected a similar claim. (*People* v. *Rodriguez* (1986) 42 Cal.3d 730, 777-779 [230 Cal.Rptr. 667, 726 P.2d 113].) And although we did not specify the constitutional grounds for our reasoning, we have also all but rejected defendant's contention that the 1978 law is constitutionally infirm for failing to place on the prosecution the burden of proof that death is the proper penalty beyond a reasonable doubt. (*People* v. *Robertson* (1989) 48 Cal.3d 18, 58-59 [255 Cal.Rptr. 631, 767 P.2d 1109] [mentioning 1978 law].) Here, defendant relies on due process and equal protection grounds. But in *Robertson* we reasoned that "To say that neither side bears the burden is not . . . to incur the risk the death sentence will be arbitrarily imposed," because the trier of fact must find the existence of at least one special circumstance beyond a reasonable doubt and find that aggravation outweighs mitigation. "Moreover, . . . the trial court . . . [must] review the trier of fact's determination to assure the weight of the evidence supports it." (*Ibid.*) The same reasoning defeats defendant's due process claim. Nor is a capital defendant in the penalty phase similarly situated to other criminal defendants for equal protection purposes. (See *People* v. *Marshall, supra,* 50 Cal.3d at p. 946.)

## IV. DISPOSITION

The judgment is reversed with regard to the murder of Patch. The multiple-murder special-circumstance finding is set aside. In all other respects, the judgment is affirmed.

Lucas, C. J., Panelli, J., Kennard, J., Arabian, J., Baxter, J., and George, J., concurred.

Appellant's petition for a rehearing was denied May 20, 1992, and the opinion was modified to read as printed above.