Filed 7/24/15  P. v. Alvarado CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>OSCAR ALVARADO,<br><br>Defendant and Appellant. | B256258<br><br>(Los Angeles County<br>Super. Ct. No. BA358128) |

APPEAL from a judgment of the Superior Court of the County of Los Angeles, Leslie A. Swain, Judge.  Affirmed in part, modified, and remanded.

Leonard J. Klaif, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald Engler, Chief Assistant Attorney General, Lance E. Winters Senior Assistant Attorney General, Victoria B. Wilson, Supervising Deputy Attorney General, Theresa A. Patterson, Deputy Attorney General, for Plaintiff and Respondent.

## INTRODUCTION

Defendant and appellant Oscar Alvarado (defendant) was convicted of aggravated mayhem (Pen. Code, § 205[1]), criminal threats (§ 422), and assault by means likely to produce great bodily injury (§ 245). On appeal, defendant contends that insufficient evidence supports his conviction for aggravated mayhem (count 2), and the abstract of judgment must be amended consistent with trial court's oral pronouncement of judgment that he was sentenced to life with the possibility of parole on count 2. The Attorney General argues that the judgment must be modified, and the abstract of judgment must be amended, to reflect that defendant was entitled to receive 83 days of conduct credit instead of 84 days. We remand the matter for the trial court to amend the abstract of judgment to reflect the trial court's oral pronouncement that defendant was sentenced to life with the possibility of parole on count 2, and to modify the judgment and amend the abstract of judgment to reflect that defendant was entitled to receive 83 days of conduct credit, for a total of 640 days of presentence custody credit. We otherwise affirm the judgment.

---

[1] All statutory citations are to the Penal Code unless otherwise noted.

# BACKGROUND

## A.    Factual Background

### 1.    Prosecution Evidence

#### a)    The Incident on November 4, 2008—Assault by Means Likely to Produce Great Bodily Injury (Count 5)

Defendant and Jennifer M. were neighbors who had known each other for many years.  In about 2008, they had an "unofficial" dating relationship.

In May 2008, while Jenifer and defendant were seeing each other romantically, Jennifer had a baby with another man.  In November 2008, Jennifer was living with her baby's father, which situation aggravated defendant.

On November 4, 2008, as Jennifer was walking home from a store after purchasing water to make milk for her child, defendant exited a hole in a nearby gate and approached her.  Defendant kicked a bag containing the purchased water that Jennifer was carrying.  Defendant also punched her several times in the face, causing her to fall to the ground.  While Jennifer was on the ground, defendant kicked her in the arms and called her "bitch" and "hoe."  Defendant took her cellular telephone.  Jennifer cried and yelled for help, but no one responded.  She got up from the ground and ran back to the store.  People from the store drove Jennifer to her home.

Jennifer's sister drove Jennifer to the police station, where Jennifer reported the incident.  Jennifer told Los Angeles Police Officer Asia Hodge that defendant had threatened her by saying, "If you're not going to be with me, you're not going to be with anybody.  I'll kill you first before I let you leave."  Jennifer also told Officer Hodge that defendant had threatened to kill her if she got back together with the father of her child.  Officer Hodge observed a small bruise or cut on Jennifer's lip, and multiple bruises on her forehead and cheeks.

b)     The incident on March 12, 2009—Aggravated Mayhem
(count 2); Criminal Threats (count 3)

On March 12, 2009, Jennifer was still living with the father of her child.  On that date, at about 8:20 p.m., Jennifer walked up to a gate outside her residence and defendant ran towards her.  Jennifer tried to run away and jump over the fence of the adjoining property, but defendant caught up to her before she could escape.  Jennifer tried to hug defendant and told defendant that he did not "want to do this."  Defendant punched Jennifer "real hard."  Defendant pulled out a "butterfly" knife.  Jennifer heard "a click sound," and defendant began stabbing her.  Jennifer previously testified at the preliminary hearing in this case that defendant said, "'If you're not going to be mine, I'm going to slice your pretty face off.'"  Defendant cut Jennifer across the right side of her face.  Defendant also stabbed Jennifer in the left arm, chest, and below the left breast.  Jennifer screamed for help.  She was bleeding profusely and was feeling weak.  Jennifer was standing against a wall, and she slid down the wall, until she eventually fell to the ground.

Jennifer's screams for help were heard by Samuel Gibson, who went outside his house to investigate the matter.  When Gibson asked defendant and Jennifer what they were doing, defendant told him to mind his own business and leave, and Jennifer told Gibson that defendant was stabbing her and pleaded for help.  Defendant left the scene when Gibson threatened to call police.  Gibson brought Jennifer to his home and called the police.  Defendant was later arrested.

Jennifer was taken to the hospital where she received staples for some of her wounds and eight stitches for her facial cut.  Los Angeles Police Department Officer Ledesma went to the hospital and spoke to Jennifer.  Jennifer stated that during the stabbing incident, defendant said, "'I'm going to kill you.  If I can't have you, no one can.'"

At the time of trial, Jennifer had a scar on her face, which went from the edge of her right nostril to the middle of her right cheek.  Dr. David Duarte, the trauma surgeon

4

who oversaw Jennifer's treatment at the hospital, explained that Jennifer's facial wound required stitches, and had Jennifer never sought medical treatment, she would have had "a divot in [her] skin."

Dr. Duarte testified that stitches do not prevent scarring because "nothing's guaranteed in medicine." Even if the stitches are removed within five days, it reduces the chances of a scar resulting, or minimizes the scar, but there could still be a scar.

In Dr. Duarte's experience, patients with facial lacerations sutured with the type of thread used for Jennifer's facial stitches end up with minimal scarring or no scarring. The longer a person waited to remove the sutures, the greater the likelihood of a scar developing. If the person waits more than two weeks to remove the sutures, it is very likely that a scar will develop.

According to Dr. Duarte, apparently based on the nurse's notes contained in Jennifer's medical records, Jennifer was told to return to the hospital in five days to have her stitches removed. Dr. Duarte however said that there was no indication in the records that she returned to the hospital.

While at the hospital Jennifer was anxious and took pain medication, including Morphine and Dilaudid. She testified that she did not recall that she was told to go back to the hospital to have the stitches removed, and said that she did not receive instructions about when to go back to remove the stitches. She testified that the hospital staff gave her a lot of paperwork, but she never looked through them because she was "emotionally, psychologically devastated."

Jennifer testified that she did not return to the hospital to have her stitches removed because she could not afford it. Approximately two to three weeks after the incident, although she was afraid to do so, Jennifer removed her own stitches.

Los Angeles Police Detective Scarlett Martinez interviewed Jennifer at her residence. Jennifer said at that time that before defendant stabbed her, he stated, "'Fuck you, bitch. If you're not going to be with me, I'm going to slice your pretty face off[.]'"

5

### 2.    *Defendant's Evidence*

Defendant was on probation in a juvenile matter, and therefore he wore a home detention ankle bracelet set up to monitor whether he remained within 150 feet of his residence.[2] There was a 10-minute "leave window," meaning that if defendant left the 150-foot radius of his home and returned within 10 minutes, no event would be reflected in the monitoring records.

Brad Collins was employed by the company responsible for monitoring defendant's ankle bracelet while defendant was under home detention. Collins testified that according to the company's records, on March 12, 2009, defendant left his home at 9:37 p.m., and returned at 9:49 p.m., and defendant left his home again at 10:00 p.m. and returned at 10:49 p.m.

Julie Guillen, who was married to defendant's cousin, lived in the back house on the property where defendant lived with his parents. Guillen testified that on March 12, 2009, she saw defendant at about 8:00 p.m., was with defendant from about 8:10 through 8:40 p.m., and shortly thereafter she saw defendant in his room.

### B.    Procedural Background

The District Attorney of Los Angeles County filed an information charging defendant with attempted murder in violation of section 187, subdivision (a) (count 1); aggravated mayhem in violation of section 205 (count 2); criminal threats in violation of section 422 (count 3); assault by means likely to produce great bodily injury in violation of section 245, subdivision (a)(1) (count 5);[3] and attempted criminal threats in violation of sections 422 and 664 (count 6). The District Attorney alleged as to counts 1 and 2 that defendant personally used a deadly and dangerous weapon within the meaning of section 12022, subdivision (b)(1). The trial court dismissed count 6 pursuant to section 1118.1.

---

**2**    Defendant's residence was located 279 feet away from Jennifer's residence.

**3**    The information did not contain a count 4.

Following trial, the jury found defendant guilty of aggravated mayhem (count 2), and found the deadly and dangerous weapon allegations to be true. The jury also found defendant guilty of criminal threats (count 3) and assault by means likely to produce great bodily injury (count 5). The jury was unable to reach a verdict on the attempted murder (count 1), and that count was dismissed.

The trial court sentenced defendant to state prison for a term of life, consisting of a term of life with the possibility of parole plus an additional one-year term for the weapon enhancement on count 2. On count 5, the trial court imposed a middle term of three years with the sentence to run consecutively to the sentence imposed on count 2. With respect to count 3, the trial court sentenced defendant to the midterm of two years, and the sentence was stayed pursuant to section 654.

The trial court awarded defendant custody credit, and ordered him to pay various fees, fines and penalties. Defendant filed a timely notice of appeal.

## DISCUSSION

### A.    Substantial Evidence Regarding Aggravated Mayhem

Defendant contends that insufficient evidence supports his conviction for aggravated mayhem in count 2. We disagree.

#### 1.    *Standard of Review*

As our Supreme Court stated, "'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] In so doing, a reviewing court 'presumes in

7

support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.]" (*People v. Edwards* (2013) 57 Cal.4th 658, 715.)

"Substantial evidence includes circumstantial evidence and the reasonable inferences flowing therefrom." (*People v. Ugalino* (2009) 174 Cal.App.4th 1060, 1064.) "We 'must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]' [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357-358.) In determining whether substantial evidence supports a conviction, "we do not reweigh the evidence, resolve conflicts in the evidence, draw inferences contrary to the verdict, or reevaluate the credibility of witnesses." (*People v. Little* (2004) 115 Cal.App.4th 766, 771, citing *People v. Jones* (1990) 51 Cal.3d 294, 314.)

### 2. Analysis

Defendant challenges the sufficiency of the evidence supporting the jury's finding that his act of cutting Jennifer's face with a knife caused the scar on her face. Defendant argues that Jennifer was negligent in failing to follow medical advice to have the stitches removed in five days, and instead removing them herself after two to three weeks, and that negligence constituted an "intervening and/or superseding cause" of the scar on her face.

The trial court instructed the jury, pursuant to CALCRIM No. 800, as follows: "The Defendant is charged in count 2 with aggravated mayhem, in violation of Penal Code section 205 in connection with the injury to Jennifer M.'s face. . . . [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] number 1, the defendant unlawfully and maliciously disabled or disfigured someone permanently or deprived someone else of a limb, organ, or part of her body; [¶] number 2, when the defendant acted, he intended to permanently disable or disfigure the other person or deprive the other person of a limb, organ, or part of her body and; [¶] number 3, under the circumstances, the defendant[']s act showed extreme indifference to the physical or psychological well-being of the other person. [¶] Someone acts maliciously when he or she intentionally does a wrongful act or when he acts with the unlawful intent

8

to annoy or injure someone else. [¶] A disfiguring injury may be permanent even if it can be repaired by medical procedures."

The trial court also instructed the jury, pursuant to CALCRIM No. 240, on causation: "An act causes permanent disfigurement if the permanent disfigurement is the direct, natural and probable consequence of the act and the permanent disfigurement would not have happened without the act or omission. [¶] A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. [¶] In deciding whether a consequence is natural and probable, consider all the evidence established by the evidence. [¶] There may be more than one cause of permanent disfigurement. An act causes permanent disfigurement only if it is a substantial factor in causing the permanent disfigurement. [¶] A substantial factor is more than a trivial or remote factor; however, it does not have to be the only factor that causes the permanent disfigurement."

"It is well established that a crime victim's contributory negligence is not a defense. [Citations.]" (*People v. Marlin* (2004) 124 Cal.App.4th 559, 569.) A defendant may be "'criminally liable for a result directly caused by his or her act, even though there is another contributing cause.'" (*People v. Catlin* (2001) 26 Cal.4th 81, 156, quoting 1 Witkin & Epstein, Cal. Criminal Law (3d. 2000) Elements, § 37, p. 243.) "The defendant remains criminally liable if either the possible consequence might reasonably have been contemplated or the defendant should have foreseen the possibility of harm of the kind that could result from his act. [Citation.]" (*People v. Crew* (2003) 31 Cal.4th 822, 847.)

The California Supreme court stated, "'In general, an "independent" intervening cause will absolve a defendant of criminal liability. [Citation.] However, in order to be "independent" the intervening cause must be "unforeseeable . . . an extraordinary and abnormal occurrence, which rises to the level of an exonerating, superseding cause." [Citation.] On the other hand, a "dependent" intervening cause will not relieve the defendant of criminal liability. "A defendant may be criminally liable for a result directly caused by his act even if there is another contributing cause. If an intervening cause is a normal and reasonably foreseeable result of defendant's original act the intervening act is

9

'dependent' and not a superseding cause, and will not relieve defendant of liability. [Citation.] '[ ] The consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough. [ ] The precise consequence need not have been foreseen; it is enough that the defendant should have foreseen the possibility of some harm of the kind which might result from his act.' [Citation.]" [Citation.]' [Citations.]" (*People v. Cervantes* (2001) 26 Cal.4th 860, 871.)

"[I]t is only an unforeseeable intervening cause, an extraordinary and abnormal occurrence, which rises to the level of an exonerating, superseding cause. [Citations.]" (*People v. Armitage* (1987) 194 Cal.App.3d 405, 420-421.) To constitute a sole or superseding cause, the victim's conduct must have been "so unusual, abnormal, or extraordinary that it could not have been foreseen. [Citation.]" (*People v. Schmies* (1996) 44 Cal.App.4th 38, 52.) Absent such conduct, evidence the victim "may have shared responsibility or fault for the accident does nothing to exonerate [a] defendant for his role" and "is not relevant." (*Id*. at p. 51.) It is generally a question of fact whether an independent act is a superseding cause of injury (*People v. Morse* (1992) 2 Cal.App.4th 620, 670), "unless undisputed evidence reveals '"a cause so remote that a court may properly decide that no rational trier of fact could find the needed nexus. [Citations.]" [Citation.]' (*People v. Cervantes*[*, supra,*] 26 Cal.4th [at pp.] 871-872 [ ].)" (*People v. Moncada* (2012) 210 Cal.App.4th 1124, 1133.)

In *People v. Roberts* (1992) 2 Cal.4th 271, the defendant was convicted of the murder of his fellow state prison inmate. At trial, the defendant argued there was evidence that tended to establish the victim died as a result of incompetent medical care and therefore the stabbing was not the proximate cause of the victim's death. (*Id*. at p. 296.) On appeal, the defendant contended that the trial court erred in failing to give his proposed modified jury instruction that the stabling was not the proximate cause of the victim's death if the medical care the victim received after the assault amounted to the sole cause of his death. (*Id*. at p. 311.)

In rejecting defendant's contention, the Supreme Court stated, "If a person inflicts a dangerous wound on another, it is ordinarily no defense that inadequate medical

10

treatment contributed to the victim's death. [Citations.] To be sure, when medical treatment is grossly improper, it may discharge liability for homicide if the maltreatment is the sole cause of death and hence an unforeseeable intervening cause. [Citations.] But here the record is devoid of any evidence of grossly improper treatment." (*People v. Roberts*, *supra*, 2 Cal.4th at p. 312.) The court held that there was no need to instruct the jury on a theory for which no evidence had been presented because the record failed to show that the treatment regimen constituted a supervening cause of death. (*Id.* at pp. 312-313.)

The jury here reasonably could conclude that Jennifer's facial scar was a direct, natural, and probable consequence of defendant's act of cutting her face with a knife. Her failure not to follow the purported medical advice to have the stitches removed within five days did not, as a matter of law, constitute a superseding or independent intervening cause of the scar.

As noted above, we review the evidence in the light most favorable to the judgment. (*People v. Edwards*, *supra*, 57 Cal.4th at p. 715.) There was conflicting evidence whether Jennifer received instructions about when to come back to remove the stitches. Dr. Duarte testified that Jennifer was told to return to the hospital in five days to have her stitches removed. Jennifer however testified that she did not receive instructions about when to come back to remove the stitches. In addition, there was evidence that even if she was given instructions about when to come back to remove the stitches, she did not comprehend or remember the instructions. When Jennifer was at the hospital, she had just experienced a traumatic event, was anxious, and took pain medication. She never looked through the substantial amount of paperwork given to her by the hospital staff because she was "emotionally, psychologically devastated." Even assuming Jennifer was instructed to return to the hospital to have her stitches removed within five days, it was reasonably foreseeable that Jennifer would not do so. Jennifer testified that she could not afford to return to the hospital to have her stitches removed.

In any event, according to Dr. Duarte, removing the stitches in a timely manner reduces the chances of a scar resulting, or minimizes the scar, but there could still be a

11

scar. If she sought no medical treatment, she would have suffered greater disfigurement. Moreover, a disfiguring injury may be "permanent" as required by aggravated mayhem, even if it can be repaired by medical procedures. (*People v. Newby* (2008) 167 Cal.App.4th 1341, 1345-1348.) Defendant intentionally injured and, in effect, said he intended to permanently disfigure Jennifer. Certainly the facts support the conclusion that defendant showed extreme indifference to Jennifer's physical well-being. There is sufficient evidence to support the aggravated mayhem conviction.

### B. Amendment of Abstract of Judgment

Defendant contends, and the Attorney General agrees, that the abstract of judgment must be amended to reflect that defendant was sentenced to life with the possibility of parole on count 2, in order to accurately reflect the trial court's oral pronouncement of judgment. We agree.

The trial court sentenced defendant to life *with* the possibility of parole on count 2. However, the abstract of judgment erroneously reflects that defendant was sentenced to life in prison *without* the possibility of parole with respect to count 2.

"[A] trial court's oral sentence governs if it is different from what appears in a minute order or an abstract of judgment [citations] . . . ." (*People v. Wynn* (2010) 184 Cal.App.4th 1210, 1221; *People v. Walz* (2008) 160 Cal.App.4th 1364, 1367, fn. 3; *People v. Mitchell* (2001) 26 Cal.4th 181, 185.) Accordingly, the abstract of judgment should be amended to reflect the trial court's oral pronouncement that defendant was sentenced to life with the possibility of parole on count 2.

### C. Modification of Judgment and Amendment of Abstract of Judgment Regarding Presentence Custody Credit

The Attorney General argues, and defendant concedes, that the judgment must be modified, and the abstract of judgment must be amended, to reflect that defendant was entitled to receive 83—not 84—days of conduct credit. We agree.

Defendant's counsel advised the trial court that defendant was entitled to 557 days of actual custody credit. The trial court then stated, "81 days of good-time/work-time credit for a total—I'm sorry, 638 days of credit. Again, that's 557 plus 81 for a total of 638." The trial court later corrected this comment, stating, "I miscalculated the good-time/work-time credits. It's 84 days of credit, so it's 648 total." The minute order, as well as the abstract of judgment, reflect that defendant was credited with 641 days of presentence custody credit, based on 557 days of actual custody and 84 days of good time/work time. The trial court's oral pronouncement of judgment, the minute order, and abstract of judgment are in error.

Defendant was in custody for a total of 557 days. A person who is sentenced to a life sentence "shall accrue no more than 15 percent worktime credit." (§ 2933.1, subd. (a).) Fifteen percent of 557 days is 83.55 days. Defendant can accrue no more than 15 percent worktime credit. He therefore is entitled to 83 days of conduct credit. (*People v. Ramos* (1996) 50 Cal.App.4th 810, 815-817.) Thus, the judgment should be modified, and the abstract of judgment must be amended, to reflect that defendant was entitled to receive 83 days of conduct credit, for a total of 640 days of presentence custody credit. (*People v. Guillen* (1994) 25 Cal.App.4th 756, 764.)

13

## DISPOSITION

The matter is remanded for the trial court to amend the abstract of judgment to reflect the trial court's oral pronouncement that defendant was sentenced to life with the possibility of parole on count 2, and to modify the judgment and amend the abstract of judgment to reflect that defendant was entitled to receive 83 days of conduct credit, for a total of 640 days of presentence custody credit. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

MOSK, J.

We concur:

TURNER, P. J.

KIRSCHNER, J.[*]

_____

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

14